## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 2:06cv00920-MHT** |
| | * | |
| **ABBOTT LABORATORIES, INC,** | * | |
| **et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## PLAINTIFF STATE OF ALABAMA'S
## <u>BRIEF IN SUPPORT OF MOTION TO REMAND</u>

Plaintiff, the State of Alabama ("the State"), submits the following brief in support of its motion to remand this case to the Circuit Court of Montgomery County, Alabama. As shown herein, this case should be remanded to the Circuit Court of Montgomery County, Alabama because the removal is untimely and because this Court lacks subject matter jurisdiction over the action. Defendants' removal – the second one in this action – is sought solely for the purpose of delay and obfuscation. Upon remand, an assessment of attorney fees and costs should be imposed against Defendants and in favor of the State pursuant to 28 U.S.C. § 1447(c).

## NATURE OF THE STATE ACTION

The State's complaint was filed on January 26, 2005, over twenty (20) months ago. The complaint asserted only state causes of action for fraudulent misrepresentation, wantonness, and unjust enrichment. The complaint was amended on April 13, 2005, adding another state cause of action for fraudulent suppression and supplementing the list of specifically named drugs at issue. The State's claims arise out of the Defendants' fraudulent reporting of prescription drug prices to industry reporting services, which prices are relied upon and used by the State to provide Medicaid reimbursement to medical or pharmacy providers who have provided drugs to Medicaid patients.

All Defendants filed motions to dismiss, and while those motions were pending, Defendants removed this action to this Court on or about July 13, 2005. In that first removal, Defendants contended that federal question jurisdiction existed pursuant to *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), and that their removal was timely because the *Grable* decision constituted an "other paper" under 28 U.S.C. § 1446(b). This Court rejected Defendants' argument and remanded this case to state court, where it belongs, on August 11, 2005. In its Order remanding this action, the Court held as follows:

> After careful consideration of the state-law claims presented in this case, the court does not believe that the claims "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."

*State of Alabama v. Abbott Laboratories, Inc., et al.*, No. 2:05cv647-T (M.D. Ala. August 11, 2005)(quoting *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 314).

The State filed a second amended complaint on January 11, 2006, further supplementing the list of subject drugs. The second amended complaint recites, just as the original and first amended complaints did, that the State's claims "involve claims arising exclusively under Alabama law" (Second Amended Complaint, ¶ 95) and that "no federal claims are being asserted in this case." (Second Amended Complaint, p. 32 n.2). Defendants concede that the Second Amended Complaint "did not contain grounds that would have made [this case] removable." *See* Notice of Removal, ¶ 29.

Since Defendants' first unsuccessful and unfounded removal attempt last year, the state trial court has moved this case forward toward prompt resolution. Multiple substantive and discovery orders have been entered, two special discovery masters have been appointed, written discovery has been exchanged between the parties, and two depositions have been taken and others scheduled. Indeed, the state trial court has scheduled trial to begin on November 26, 2007, just over one year from now. This second removal is yet another unfounded attempt by Defendants to delay this matter, obfuscate the progress furthered in the Alabama trial court, and escape the State's selected forum.

Defendants do not seek this Court's venue for disposition of this case; rather, Defendants are attempting to transfer this case to multi-district litigation in Boston, Massachusetts, with cases that encompass claims and issues not asserted in the State of Alabama's case. That transfer would impede the resolution of this case and work a substantial hardship on the State of Alabama. The State of Alabama, as a sovereign and the master of its own claims, is entitled to have its lawsuit, based purely on state law

claims, heard in its original chosen forum – the Circuit Court of Montgomery County, Alabama.

## ARGUMENT

This lawsuit has been improperly removed to this Court, for a second time, and should be remanded to the Circuit Court of Montgomery County, Alabama, where it was originally filed. Contrary to the assertions in Defendants' removal petition, this Court lacks subject matter jurisdiction over the action because the federal False Claims Act does not confer original federal jurisdiction over state claims in state cases. This Court need not even reach that jurisdictional argument, however, because other readily apparent procedural deficiencies dictate remand.

## I.    Defendants Bear a Significant Burden on Removal.

The standard for removal to federal court is stringent. The defendant, as the removing party, bears the significant burden of establishing federal jurisdiction over the litigation. *See Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 n.4 (11th Cir. 1998); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). "Removal is a statutory privilege, rather than a right, and the removing party must comply with the procedural requirements mandated in the statute when desirous of availing the privilege." *Jerrell v. Kardoes Rubber Co., Inc.*, 348 F. Supp. 2d 1278, 1283 (M.D. Ala. 2004)(citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104 (1941)). Once a case has been removed to federal court, the non-removing party may move for remand which will be granted if "it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Remand is also warranted when the removing party has failed to comply with

the statutory requirements for removal. *See, e.g., Brown v. Demco, Inc.*, 792 F.2d 478, 482 (5th Cir. 1986)(ordering remand due to untimeliness of removal); *Adams v. Charter Communications VII, LLC,* 356 F. Supp. 2d 1268, 1273 (M.D. Ala. 2005)(granting motion to remand where removal was untimely); *Jerrell*, 348 F. Supp. 2d at 1283 (granting motion to remand where all Defendants failed to timely consent to removal).

Because removal jurisdiction raises significant federalism concerns, "removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand." *Burns*, 31 F.3d at 1095; *Univ. of S. Ala. v. Amer. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999).  Indeed, the "letter of the law is clear and it requires strict construction of the language of the [removal] statute" and "all doubts about removal must be resolved in favor of remand." *Jerrell*, 348 F. Supp. 2d at 1281, 1283; *McCaslin v. Blue Cross and Blue Shield of Ala.*, 779 F. Supp. 1312, 1314 (N.D. Ala. 1991).

In this district, the Court has explained as follows:

> As a general principle, the removal statutes are to be construed narrowly. Thus, even though § 1446's time requirement is not jurisdictional, the time requirement is mandatory and must be strictly applied.  Timely objection to a late petition for removal will therefore result in remand.

*Webster v. Dow United Tech. Composite Prods., Inc.*, 925 F. Supp. 727, 729 (M.D. Ala. 1996)(internal citations omitted); *Adams*, 356 F. Supp. 2d at 1272.

In this case, remand is warranted both because of procedural defects due to Defendants' untimely filing of the notice of removal and because this Court does not

have original jurisdiction over the State of Alabama's claims, and therefore, this Court lacks subject matter jurisdiction over the case.

## II.    Defendants' Removal Is Untimely And Procedurally Improper.

Defendant Dey, L.P., filed its Notice of Removal on October 11, 2006, relying on 28 U.S.C. § 1446(b). Dey contends that the unsealing in Massachusetts of a federal *qui tam* action against it, which is based on similar allegations as the State's action, constitutes a "pleading, order, or other paper" from which Dey was first able to ascertain that the Alabama case had become removable. *See* Notice of Removal, ¶ 38. Dey also suggests that the state law claims against the other 72 Defendants fall within this Court's supplemental jurisdiction, 28 U.S.C. § 1367.[1]

This second removal is improper and unsupportable, just as the first removal was.

### A.    The unsealing of a federal *qui tam* action to which the State is not a party is not an "amended pleading, order, or other paper" pursuant to 28 U.S.C. § 1446(b) upon which removal can be based.

Federal law limits the period in which a defendant may exercise his removal right from state to federal court. The second paragraph of 28 U.S.C. § 1446(b), under which Dey attempts to travel,[2] provides as follows:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . .

---

[1] However, as shown below, at least one of the other Defendants did not properly consent to the removal, thereby negating the unanimity among defendants required in this Circuit.

[2] Dey concedes, as it must, that the new basis for removal set forth in its Notice of Removal was not raised within 30 days of the State of Alabama's Second Amended Complaint. *See* Notice of Removal, ¶¶ 22, 29.

Dey contends that its receipt of the unsealed federal *qui tam* action against it brought by the United States under the False Claims Act triggered the 30-day period for removal pursuant to 28 U.S.C. § 1446(b).  *See* Notice of Removal, ¶ 38.  Dey conspicuously avoids identifying whether it contends that the federal *qui tam* complaint is an "amended pleading," a "motion," an "order," or an "other paper."  Nevertheless, it makes no difference what Dey contends because the plain language, legislative history, and case law interpreting section 1446(b) clearly establish that the statute applies only to an event occurring in the state court action being removed and resulting from a voluntary act of the plaintiff.  Dey cites no legal authority to support its position, and there is none.

### 1. Section 1446(b) applies only to events occurring within the state court action being removed.

### a. The plain language of § 1446(b).

The plain language of section 1446(b) makes clear that it applies only to events that occur within the state court action being removed.  In *Morsani v. Major League Baseball*, 79 F. Supp. 2d 1331 (M.D. Fla. 1999), one of the leading cases interpreting § 1446(b), the district court examined numerous cases that addressed the issue and summarized the state of the law as follows:

> Many courts have examined and rejected the defendants' argument that an order entered in another case may constitute an "order or other paper" pursuant to Section 1446(b).  These courts interpret Section 1446(b) to refer only to "an amended pleading, motion, order or other paper" that arises within the case for which removal is sought.  The plain language of the statute, referring to the "receipt by the defendant, through service or otherwise," implies the occurrence of an event within the proceeding itself; defendants do not in the ordinary sense "receive" decisions entered in unrelated cases.  Accordingly, the courts consistently hold that publication of an order on a subject that might affect the ability to remove an unrelated

state court suit does not qualify as an "order or other paper" for the purposes of Section 1446(b).

*Id.* at 1333 (omitting footnote that lists the many decisions upon which it relied).

The same conclusion was reached in *Kocaj v. Chrysler Corp.*, 794 F. Supp. 234 (E.D. Mich. 1992):

> Simply put, a plain reading of the second paragraph of § 1446(b) elicits the conclusion that the term "other paper" means a paper in the state court action that does not constitute "an amended pleading, motion, [or] order." As the court in *Holiday [v. Travelers Ins. Co.*, 666 F. Supp. 1286 (W.D. Ark. 1987)] aptly observed, such "other paper" could, for example, be a plaintiff's response to a summary judgment motion, answers to interrogatories, or statements of a plaintiff. *Holiday* at 1290 (citing cases). Defendant's interpretation of "other paper," broadly construing such term to include even a decision in an unrelated action, ignores the preceeding language in § 1446(b) – "within thirty days after *receipt* by the defendant, through service or otherwise" (emphasis added) -- which language plainly refers to items served or otherwise given to a defendant in a state court case.

*Id.* at 237.

This construction of the statute is widespread and has been adopted by many district courts. *See Rose v. Beverly Health & Rehab. Servs., Inc.*, 2006 WL 2067060, at *5 (E.D. Cal. July 22, 2006) ("the phrase 'other paper' has been interpreted as 'documents generated within the state court litigation'"); *Burns v. Prudential Sec., Inc.*, 2006 WL 1932310, at *4 (N.D. Ohio July 10, 2006) ("A court decision in an unrelated case does not constitute a 'motion, order, or other paper' for § 1446(b) purposes and does not, therefore, create a new 30-day period during which a defendant can remove a case."); *Elm v. Soo Line R.R.*, 2006 WL 1426594, at *2 (D. Minn. May 22, 2006) ("courts have generally held that 'other paper' refers 'solely to documents generated within the

state court litigation itself'''); *Craft v. Philip Morris Co.*,  2006 WL 744415, at *6 (E.D. Mo. Mar. 17, 2006) ("the most logical interpretation of the plain language of the statute, 'amended pleading, motion, order or other paper' is that 'order or other paper' refers to only records in the state case"); *Black v. Brown & Williamson Tobacco Corp.*, 2006 WL 744414, at *6 (E.D. Mo. Mar. 17, 2006) (same); *Allen v. Monsanto Co.*, 396 F. Supp. 2d 728, 731 (S.D. W. Va. 2005) ("courts universally hold that a court decision in separate, unrelated case does not constitute 'other paper' for removal purposes"); *Klink v. Metavante Corp.*, 2002 WL 31962610, at *2 n.1 (E.D. Mich. Dec. 16, 2002); *Sclafani v. Ins. Co. of N. Am.,* 671 F. Supp. 364, 365 (D. Md. 1987) (Section 1446(b) "'relates only to papers filed in the action itself which alter or clarify the stated claim so as to reveal for the first time that a federal cause of action is stated'")(quoting *Avco Corp. v. Int'l Union*, 287 F. Supp. 132 (D. Conn. 1968); *Lozano v. GPE Controls*, 859 F. Supp. 1036, 1038 (S.D. Tex. 1994)(the term "other paper" refers to papers generated within the specific state proceeding to be removed and not other unrelated judicial opinions that might suggest removability); *Johansen v. Employee Benefit Claims, Inc.,* 668 F. Supp. 1294, 1296 (D. Minn. 1987) ("every court which has faced the issue present in this case has construed the phrase 'or other paper' as referring solely to documents generated within the state court litigation itself"); *Avco Corp. v. Int'l Union*, 287 F. Supp. 132, 133 (D. Conn. 1968)("order or other paper" refers only to papers filed in proceeding itself, not to unrelated Supreme Court opinion); *see also O'Bryan v. Chandler*, 496 F.2d 403, 412 (10th Cir. 1974)(noting *Avco* was rightly decided).

**b.    The legislative history of § 1446(b).**

The legislative history of 28 U.S.C. § 1446(b) also supports the conclusion that the statute is limited to events occurring in the state court action that is being removed. *McCormick v. Excel Corp.*, 413 F. Supp. 2d 967 (E.D. Wis. 2006), contains the most recent explanation of the legislative history:

> The legislative history of § 1446(b) also supports an inference that Congress intended to limit order and other paper to documents in the pending case. This is so because prior to 1949, when Congress amended § 1446(b), the Supreme Court had developed case law interpreting *Powers v. Chesapeake & Ohio Ry. Co.,* 169 U.S. 92, 18 S. Ct. 264, 42 L. Ed. 673 (1898), as standing for the proposition that a case that became eligible for removal after the initial complaint could be removed only as the result of a voluntary act by the plaintiff. *See* Adam C. Clainton, *Uncertainty in Federal Removal Procedure: The Riddle of the "Other Paper"*, 71 Def. Couns. J. 388, 393, 401 (Oct. 2004) (stating that although 1446(b) does not mention a "voluntariness" requirement, courts have read such limitation into it in light of the House report stating that the amendment was "declaratory of the existing rule laid down by" such decisions as *Powers* ). Although courts have criticized the so-called "voluntary/involuntary" rule as overly formalistic, *see Lyon v. Ill. Cent. Ry. Co.,* 228 F. Supp. 810, 811 (S.D. Miss. 1964), the circuit courts have generally followed it, *see e.g., Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 71-72 (7th Cir. 1992). It may reasonably be inferred from Congress's endorsement of the rule that Congress also intended to limit order and other paper to documents in the case being removed. *See* 17 *No. 2 Fed. Litigator,* 30 (Feb. 2002) (indicating that the voluntariness requirement leads to the conclusion that order or other paper refers only to documents to the case being removed). A plaintiff can only generate documents in a case that is pending.

*Id.* at 971.

Because the federal government's unsealing and service upon Dey of the federal *qui tam* complaint in Massachusetts is not an event that occurred within the Alabama state action, it cannot serve as the basis for removal of this action.

### 2.    Section 1446(b) applies only to voluntary acts of the plaintiff.

In addition to being limited to events that occur within the state court action from which removal is sought, 28 U.SC. § 1446(b) is also limited to voluntary acts of the plaintiff.  16 James Wm. Moore et al., *Moore's Federal Practice* §107.30[3][e] (3d ed. 2005) ("[T]o constitute 'other paper,' the paper must result from the voluntary act of a plaintiff and give the defendant notice of the changed circumstances that now support federal jurisdiction.")(emphasis added); *see also Addo v. Globe Life & Acc. Ins. Co.*, 230 F.3d 759, 762 (5th Cir. 2000) ("'other paper' must result from the voluntary act of a plaintiff which gives the defendant notice of the changed circumstances which now support federal jurisdiction.")(citing *SWS Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996)); *California v. Keating*, 986 F.2d 346, 348 (9th Cir. 1993);  *Morsani*, 79 F. Supp. 2d at 1333 n.5 ("In both federal question and diversity cases . . . Section 1446(b) restricts defendants from removing most cases when the circumstance potentially allowing removal arises through no consequence of the plaintiff's actions"); *Dowd v. Alliance Mortgage Co.*, 339 F. Supp. 2d 452, 455 (E.D.N.Y. 2004)("involuntary changes in a case do not create removability if the plaintiff's complaint was not removable"); *Henderson v. City of Chattanooga*, 2002 WL 32060139, at *5 (E.D. Tenn. Mar. 15, 2002) ("A state court case that initially is non-removable cannot subsequently become removable or be transformed into a removable case unless a change occurs that makes it removable as a result of the plaintiff's voluntary act."); *Stauffer v. Citizens Alliance Educ. Found.*, 2001 WL 34039481, at *2 (D. Or. Dec. 14, 2001)(rejecting contention that notice from Secretary of State constituted "other paper"); *cf., e.g., Shields v. Washington Nat.*

11

*Ins. Co.*, 375 F. Supp. 2d 1346, 1349 (M.D. Ala. 2005)(deposition testimony of plaintiff constituted "other paper" under 28 U.S.C. § 1446(b) in determining timeliness of removal). "This result is consistent with the well-established 'voluntary/involuntary rule' applied to diversity cases removed pursuant to Section 1446(b). Under this rule, a state court case that is initially non-removable, but which subsequently becomes removable, may nevertheless not be removed unless the change that makes the case removable is the result of the plaintiff's voluntary act. In both federal question and diversity cases, therefore, Section 1446(b) restricts defendants from removing most cases when the circumstance potentially allowing removal arises through no consequence of the plaintiff's actions." *Morsani*, 79 F. Supp. 2d at 1333 n.5 (internal citations omitted).

Dey's argument also contravenes the "well-pleaded complaint rule" which provides that "[a] case may be removed based on federal question jurisdiction <u>only when the plaintiff's statement of his own cause of action</u> shows that it is based on federal law." *Blab T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 854 (11th Cir. 1999)(emphasis added)(citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908)). The State, as plaintiff, is "'master of the claim' and may prevent removal by choosing not to plead an available federal claim." *Id.*

Here, the State has done absolutely nothing to alter the status of this case. It has not filed or submitted an amended pleading, motion, or other paper making this case removable. Further, no order has been entered in this action causing it to become removable. The State's complaint exclusively alleges four state law claims, and this Court has previously held that no federal issues exist.

12

In sum, because the service of the unsealed federal *qui tam* complaint upon Dey was not an action by the State of Alabama (voluntary or otherwise), it is not an event that falls within 28 U.S.C. § 1446(b).

### 3. Dey and the other defendants have known that § 1446(b) does not support removal in this instance.

This is not the first time that Dey and the other defendants have argued that an event external to a state Attorney General AWP case occurring more than 30 days after service of the complaint re-starts the 30-day removal clock pursuant to 28 U.S.C. § 1446(b). In July 2005, the Defendants removed this case and several other state Attorney General AWP cases, asserting that the Supreme Court's decision in *Grable & Sons Metal Prods., Inc. v. Darue*, 545 U.S. 308 (2005), changed the law of federal question jurisdiction and constituted an "order or other paper" within the meaning of Section 1446(b). The State of Alabama, as well as other states at issue, filed motions to remand, arguing, among other things, that an intervening Supreme Court decision did not constitute an "order or other paper" pursuant to Section 1446(b). While this Court did not specifically address this issue in its order, it impliedly rejected Dey's position by ordering remand. Moreover, every other federal court that did address the issue expressly rejected Defendants' argument, including the federal court in Boston to which Defendants seek to transfer this action. *See Minnesota v. Pharmacia Corp.*, No. 05-1394, at 4-5 (D. Minn. Oct. 24, 2005) (attached as Exhibit A hereto); *Pennsylvania v. Tap Pharm. Prods., Inc., et al.*, 415 F. Supp. 2d 516, 526-27 (E.D. Pa. 2005); *Wisconsin v. Abbott Labs., Inc., et al.*, 390 F. Supp. 2d 815, 824-25 (W.D. Wis. 2005); *In re Pharm.*

*Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98, 109 (D. Mass. 2006). Defendants' reassertion in the same case of a baseless and unsupportable position requires remand and an award of attorney fees.[3]

>    **B.    Applying Dey's theory, the unsealing of a similar federal *qui tam* action against Defendant Abbott Laboratories on May 26, 2006 makes Dey's removal untimely.**

Under Dey's "other paper" theory (which, as explained above, is completely untenable), the removal was untimely and otherwise procedurally improper. Section 1446(b) requires removal "within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may be first ascertained that the case is one which is or has become removable." Applying Dey's logic (however faulty) to the circumstances at hand, this case was removable at least 3½ months ago when the United States District Court for the Southern District of Florida unsealed and served on Abbott Laboratories, Inc. ("Abbott"), on May 26, 2006, a complaint under the federal False Claims Act, making the same allegations against Abbott which are made against Dey in the Massachusetts federal *qui tam* action. (*Compare* Exhibit B attached hereto with Exhibit A to the Notice of Removal.)

Both Dey and Abbott are defendants in the underlying Alabama state court case. If Dey had a right to remove (which the State denies) based upon the unsealing and service of the federal *qui tam* action against Dey, then Abbott likewise had a right to

---

[3] This conduct warrants an assessment of attorney fees and costs against Defendants, pursuant to 28 U.S.C. 1447(c), for this improper removal, as discussed more fully below.

remove this case to federal court when the federal *qui tam* action in Florida was unsealed and served on Abbott on May 26, 2006. The federal *qui tam* claims against Dey are identical to the claims by the United States against Abbott which were made public on or before May 26, 2006. (*See* Exhibit C attached hereto, Department of Justice Press Release dated May 18, 2006).

Dey takes the position in its Notice of Removal (¶5) and its October 12, 2006 letter to Montgomery County Circuit Judge Charles Price (*see* Exhibit D attached hereto) that the existence of a federal *qui tam* action alleging the same transactions which are at issue in the state court action creates federal jurisdiction. Therefore, according to Dey's theory, federal question jurisdiction existed at least as early as the filing and unsealing of the United States' False Claims Act complaint against Abbott in the Florida federal court.

Applying Dey's argument, Abbott had the right to remove the Alabama case on May 26, 2006, allowing Dey to join in the removal.[4] Thus, Dey's notice of removal filed on October 11, 2006 is untimely, having been filed more than 30 days after Abbott was served and Dey was otherwise made aware of the public filing of the federal False Claims Act complaint against Abbott.

Moreover, Abbott's joinder in the instant removal by Dey is untimely and ineffective because Abbott itself could have (again under Dey's theory) filed a notice of removal as early as May 26, 2006. Indeed, Abbott waived its right to removal, which also now precludes other defendants from seeking removal. *See*, *e.g.*, *Estate of Krasnow*

---

[4] Under this theory, the other state AWP cases where Abbott and Dey are co-defendants – including those pending in Illinois, Kentucky, Mississippi, Ohio, Pennsylvania and Wisconsin – were also removable on that date.

*v. Texaco, Inc.*, 773 F. Supp. 806, 809 (E.D. Va. 1991)(individual defendant's waiver of right of removal constituted "constructive" waiver for all other co-defendants); *Crocker v. A.B. Chance Co.*, 270 F. Supp. 618, 618-19 (S.D. Fla. 1967)(waiver by one defendant for failure to timely file a removal petition bars removal by subsequently joined defendants).  Since Abbott waived its right to removal (again following Dey's removal theory) and its joinder is untimely and ineffective, all defendants have not joined in or consented to the removal on a timely basis, and the case must be remanded on procedural grounds.  *See Russell Corp. v. Am. Home Assurance Co.*, 264 F.3d 1040, 1044 (11th Cir. 2001)(Eleventh Circuit follows the "rule of unanimity," requiring that all defendants join in a removal petition or consent to removal in cases involving multiple defendants).

**C.    All Defendants did not consent to the removal in accordance with Rule 11.**

Federal Rule of Civil Procedure 11 requires that "every pleading, written motion, and other papers shall be signed by at least one <u>attorney of record</u> in the attorney's individual name . . .". (emphasis added).  The United States Supreme Court has interpreted Rule 11 as imposing a <u>non-assignable</u> duty of certification, recognizing that the role of Rule 11's signature requirement and its potential sanctions "is to bring home to the individual signer his personal, non-delegable responsibility." *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989).  Courts, including the Middle District of Alabama, typically find that signatures by a third party on behalf of an attorney or party do not satisfy Rule 11's certification requirements.  *See, e.g., Beard v. Lehman Bros. Holdings, Inc.*, 2006 WL 2661170 *3 (M.D. Ala. Sept. 15, 2006); *see also Boyle v.*

*City of Liberty*, 1993 WL 20177, at *4 (W.D. Mo. Jan. 29, 1993)("If Rule 11 requires a personal signature of the attorney of record, then a signature on behalf that attorney is not enough."); *Kobleur v. Group Hosp. and Med. Servs., Inc.*, 787 F. Supp. 1444, 1453 (S.D. Ga. 1991)(lack of signature by attorney of record constituted violation of Rule 11 warranting sanctions).

In this case, "David Martin," an unidentified person not of record, signed the consent form for George W. Walker, III, Defendant Par Pharmaceutical, Inc.'s counsel of record. (*See* Exhibit E attached hereto). Mr. Walker did not personally sign the pleading, although his name and bar number are typed on it. Mr. Martin has never made an appearance in this case and is not identified as a lawyer with a bar number. Because no attorney of record for Par Pharmaceutical personally signed a consent to removal, Rule 11 has not been satisfied. Moreover, since 28 U.S.C. § 1446(a) specifically requires that the notice of removal be signed pursuant to Rule 11 and because consents must be timely filed within the same 30-day time period as the removal, this defect prevents compliance with the removal statute. The failure to comply with the Rule 11 requirement prevents successful joinder in the removal petition by Defendant Par Pharmaceutical, which is a substantial procedural defect. *See Beard*, 2006 WL 2661170, at *4-6; *see also Russell Corp.*, 264 F.3d at 1044 (Eleventh Circuit requires unanimity among all defendants joining in a removal petition or consent to removal).

The mere assertion by Dey in its removal petition that all Defendants consent to the removal fails to constitute sufficient joinder. *Beard*, 2006 WL 2661170, at *4; *Newman v. Spectrum Stores, Inc.*, 109 F. Supp. 2d 1342, 1346 (M.D. Ala. 2000). "A

17

consent may not be implied, but rather, it must be express." *Jerrell v. Kardoes Rubber Co., Inc.*, 348 F. Supp. 2d 1278, 1282 (M.D. Ala. 2004).

Federalism concerns compel this Court to strictly enforce removal procedures, and parties must meticulously comply with the requirements of a statute in order to avoid remand. *See Beard*, 2006 WL 2661170, at *2. Under our system of limited federal jurisdiction which respects the sovereignty of the state courts, this Court cannot disregard an evident procedural defect, even a trivial or inadvertent defect. *Id.* Because all Defendants did not file notice of their consent to removal within the 30-day time period which is mandated under 28 U.S.C. § 1446(b), remand is required.

## III. <u>This Court Lacks Subject Matter Jurisdiction Over the Underlying Action.</u>

Remand of this action is required because there is no original federal jurisdiction – a necessity for removal – over the underlying state law claims. "Only state-court actions that originally could have been filed in federal court may be removed by the defendant. . . . The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)(internal citations omitted).

**A.     The federal False Claims Act does not confer original jurisdiction over the State's claims.**

Dey contends that this Court has original jurisdiction over the Alabama action pursuant to 31 U.S.C. § 3732(b), a provision in the federal False Claims Act ("FCA"). That contention is incorrect.  As demonstrated below, this Court does not have original jurisdiction over Alabama's action.  At most, section 3732(b) provides for supplemental jurisdiction over Alabama's claims against Dey, but permits only the State, rather than Dey, to determine whether to bring these claims in federal court.  Moreover, it is well-established that actions for which the district courts have only supplemental jurisdiction may not be removed.  *See, e.g., Syngeta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 34 (2002) ("Ancillary jurisdiction . . . cannot provide the original jurisdiction that petitioners must show in order to qualify for removal under § 1441."); *Ahearn v. Charter Township of Bloomfield*, 100 F.3d 451, 456 (6th Cir. 1996) (supplemental jurisdiction statute is not a source of original subject-matter jurisdiction and case is not removable on basis of supplemental jurisdiction).  Courts in the Eleventh Circuit are in accord.  *See, e.g.*, *Darden v. Ford Consumer Fin. Co., Inc.*, 200 F.3d 753, 755 (11th Cir. 2000)(removal jurisdiction exists only when the district court would have had <u>original</u> jurisdiction over the action); *Keene v. Auto Owners Ins. Co.*, 78 F. Supp. 2d 1270, 1273-74 (S.D. Ala. 1999)(holding that the supplemental jurisdiction statute cannot serve as an "independent source of removal jurisdiction"); *Brown v. Prudential Ins. Co. of Am.*, 954 F. Supp. 1582, 1584 (S.D. Ga. 1997)(holding that supplemental jurisdiction does not provide the original jurisdiction necessary for removal under section 1441).

It is Dey's burden, and a heavy one, to establish that this court has original jurisdiction over Alabama's claims against Dey pursuant to 31 U.S.C. § 3732(b). That statute provides:

> The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730.

It is clear that this statute does not confer original jurisdiction over Alabama's claims against Dey from the plain language of § 3732(b) as well as from the overall structure, legislative history of the False Claims Act, and case law.

By its express terms, the statute does not provide a grant of original jurisdiction. Congress could have explicitly provided for original jurisdiction, as it has done in over 80 other statutes, but it did not. *See*, *e.g*., 15 U.S.C. § 6614(c)(1) ("the district courts of the United States shall have <u>original jurisdiction</u> of any Y2K action that is brought as a class action"); 9 U.S.C. § 203 (regarding enforcement of foreign arbitral awards, stating the "district courts of the United States … shall have <u>original jurisdiction</u> over such an action …."); 5 U.S.C. § 9007 (regarding long-term care insurance, stating the "district courts of the United States have <u>original jurisdiction</u> of a [such] civil action or claim …."); 12 U.S.C. § 1441a (a)(11) ("any civil action, suit, or proceeding to which the Thrift Depositor Protection Oversight Board is a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have <u>original jurisdiction</u>.").

The jurisdiction over state claims provided by section 3732(b) is <u>supplemental</u> jurisdiction. It operates like any other supplemental jurisdiction provision – it is entirely dependent on the existence of <u>another</u> claim for which there is original jurisdiction. Because the term "supplemental jurisdiction" was not coined until 1990, four years after 31 U.S.C. § 3(b) was codified, it makes perfect sense that section 3732(b) only uses the term "jurisdiction."

The FCA, when read as a whole, clearly demonstrates that section 3732(b) merely provides for supplemental jurisdiction. Section 3732(b) is an exception to the general bar on intervention by all other parties except for the United States in a federal FCA action, permitting states and local governments to join or intervene in a federal FCA action when it grows out of the same transaction or occurrence as the state or local government claims. Under 31 U.S.C. § 3730(b)(5), only the United States "may intervene or bring a related action based on the facts underlying" the federal FCA action. Accordingly, the codification of 31 U.S.C. § 3732(b) provides a vehicle for a state to join a pending FCA action brought by the United States to recover state funds lost due to actions growing out of the same transaction or occurrence as the federal FCA claim. That is, section 3732(b) operates to avoid the need to answer questions about whether a State can (or need) be a *qui tam* relator in order to recover.[4] Without section 3732(b), some courts have held, states would be barred from intervention. *See United States ex rel. Long v. SCS Bus. &*

---

[4] *See United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984) (pre-1986 amendments case finding a State may not be a relator), *superseded by statute*; *cf. Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 n.18 (2000) (leaving open question whether a State is a "person" under the Federal False Claims Act for purposes of commencing suit).

*Technical Inst., Inc*., 173 F.3d 870, 880 (D.C. Cir. 1999) ("§ 3732(b) … authorizes permissive intervention by states for recovery of state funds (creating what is in effect an exception to § 3730(b)(5)'s apparent general bar on intervention by all other parties except for the United States)").  Thus, 31 U.S.C. § 3732(b) provides a means for a State or local government plaintiff to be the master of its own claim when there is a related pending federal FCA action.

Dey has not cited, and the State has not located, a single case concluding that 31 U.S.C. § 3732(b) constitutes a basis of original federal subject matter jurisdiction. Rather, case law addressing 31 U.S.C. § 3732(b) supports the conclusion that it provides a method for State and local governments <u>permissively</u> to join a federal FCA action growing out of the same transaction or occurrence.  The United States Circuit Court of Appeals for the District of Columbia Circuit found that "[t]he more obvious reading of § 3732(b), however, is that it authorizes <u>permissive intervention by states</u> for recovery of state funds (creating what is in effect an exception to § 3730(b)(5)'s apparent general bar on intervention by all other parties except for the United States)."  *SCS Bus. & Technical Inst., Inc.*, 173 F.3d at 880 (emphasis added, parenthetical in original); *see United States ex rel. Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 205 (2d Cir. 1998) ("another 1986 amendment, . . . <u>permits the joinder</u>, in an FCA suit, of related state-law claims where those claims are 'for the recovery of funds paid by a State . . .'") (emphasis added), *overruled on other grounds*, 529 U.S. 765 (2000);  John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.01[B], at 4-20 (2006) ("[T]his provision does not require the state to be a relator for jurisdiction to exist. Theoretically, a state could

intervene in a federal False Claims Act suit to assert its own damages, and the *Long* court concluded that this type of permissive intervention is the more obvious interpretation of Section 3732(b)."); *see also United States v. Sequel Contractors, Inc.*, 402 F. Supp. 2d. 1142, 1148-49 (C.D. Cal. 2005) (permitting Orange County, California to join its claims under the California False Claims Act with a federal FCA action under both 31 U.S.C. § 3732(b) and the general federal supplemental jurisdiction statute); *United States ex rel. LaCorte v. Merck & Co., Inc.*, 2004 WL 595074, at *7 (E.D. La. 2004) (permitting the State of Louisiana to intervene in a federal FCA case under 31 U.S.C. § 3732(b) to pursue claims under Louisiana state law).

Furthermore, the legislative history of section 3732(b) makes clear that Congress intended for this provision to enhance the options of states, not restrict them. Section 3732(b) was added by the 1986 Amendments to the FCA at the urging of the National Association of State Attorneys General ("NAAG"). As the Senate Report accompanying the 1986 Amendments provides:

> And finally, in response to comments from the National Association of Attorneys General, the subcommittee adopted a provision *allowing State and local governments to join* State law actions with False Claims Act actions brought in Federal district court if such actions grow out of the same transaction or occurrence.

S. Rep. No 345, 99th Cong., 2d Sess., at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5281 (emphasis added). Thus, the purpose of section 3732(b) was to permit, not require, states and local governments to join pending federal FCA actions growing out of the same transaction or occurrence. *See SCS Bus. & Technical Inst., Inc*., 173 F.3d at 880 (Section 3732(b) "authorizes permissive intervention by states for recovery of state

23

funds") (emphasis added). It would belie common sense to conclude that NAAG urged Congress to enact a statute stripping states of their ability to bring state law claims in state court and <u>requiring</u> all state law actions to be brought in federal court, or – as Dey contends here – permit a defendant to drag a case alleging purely state law claims out of state court when there happens to be a pending federal FCA action growing out of an allegedly similar transaction or occurrence. Indeed, it makes little sense that Congress would take such a drastic step to turn over control of the choice of forum to a defendant without making any mention of this purpose. Dey's argument is that Congress engaged in a drastic expansion of federal jurisdiction over traditional state actions and intended to add enormous burdens to federal courts and the United States Department of Justice (which, under Dey's theory, would have to deal with any and all similar state complaints anytime a federal FCA action is filed) – all without a single statement or indication that this is what Congress intended. Such an argument is clearly without merit.

Section 3732(b) was not meant to tread on the states' sovereignty in choosing the forum in which to bring their state law claims. Rather, it was meant to broaden their choices. When a state or local government desires to pursue an action arising from the same transaction or occurrence as a pending federal FCA action, section 3732(b) provides the option of choosing a federal forum to State and local governments, <u>not</u> to defendants.

Moreover, nothing in the FCA supports Dey's contention that Alabama's action and the federal *qui tam* action "should be litigated in a single forum." *See* Notice of Removal, ¶ 40. For this proposition, Dey relies on 31 U.S.C. § 3730(b)(5), which states

that "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action" and states that Alabama's action "must yield to the federal action in the event of any conflict." *Id*., ¶ 42. Dey also relies on section 3732(b) with the mistaken reasoning that since that section grants federal jurisdiction over state actions related to a pending federal action, the section <u>requires</u> that the state claims be litigated in federal court. Neither argument supports Dey's contention.

First, section 3730(b)(5)'s ban does not apply to the states. This section is directed exclusively at actions by private parties (*see* 31 U.S.C. 3730(b), entitled "Actions by Private Parties"), and Dey cites no case that holds that a state may not bring a state court action to recover state funds because of a pending federal FCA action. To the extent that some courts have applied section 3730(b)(5) to states, these court have recognized that Section 3732(b) provides an exception to the bar, thus allowing states to join FCA suits. *See SCS Bus. & Technical Inst., Inc*., 173 F.3d at 880 ("§ 3732(b) … authorizes permissive intervention by states for recovery of state funds (creating what is in effect an exception to § 3730(b)(5)'s apparent general bar on intervention by all other parties except for the United States)").

Moreover, federal courts have rejected the maneuver of removing an action without original jurisdiction to "marry up" with a similar action pending in federal court, "even if the action which a defendant seeks to remove is related to another action over which the federal district court already has subject-matter jurisdiction, and even if removal would be efficient." *Ahearn*, 100 F.3d at 456 (citations omitted). "An already-existing federal action cannot provide a mechanism for removal of a non-removable

25

state-court action." *In re Estate of Tabas*, 879 F. Supp. 464, 467 (E.D. Pa. 1995); *Ahearn*, 100 F.3d at 456; *Seabring Homes Corp v. T.R. Arnold & Assocs.*, 927 F. Supp. 1098, 1101 (N.D. Ind. 1995) (existence of a separate, but related, suit in federal court is not a basis for removal); *N. Am. Van Lines, Inc. v. Coleman*, 633 F. Supp. 632, 634 (N.D. Ill. 1986) (rejecting as "wholly fanciful," the use of an already-existing federal action as a basis of removal under § 1441(c)).

Indeed, even when a state law case is removed directly to <u>the exact district</u> where the similar federal case is pending, federal courts have rejected a defendant's attempt to remove the case to join it with the federal action. In *Tafuri v. Jeppson Sanderson Co.*, 25 F. Supp. 2d 1364, 1368–69 (S.D. Fla. 1998), the defendants asserted their case was properly removed because the federal district court had supplemental jurisdiction over the purely state law action, "based upon its original jurisdiction over related and consolidated cases in [a] multidistrict litigation." *See id.* at 1365–66. Relying on the *Ahearn* and *Tabas* line of cases, the court concluded that "the pendency of numerous cases in . . . multidistrict litigation . . . , over which the Court has original jurisdiction, does not cure the absence of original jurisdiction in the [state law] suit" and remanded the case. *Id.* at 1368–69.

Accordingly, neither efficiency nor joining a similar or identical action already existing in federal court, whether in the district removed to or elsewhere, can create original jurisdiction when it is lacking. Defendants' assertions that these grounds in any way justify or buttress their removal of this case without original jurisdiction are entirely without merit.

**B.      This case is different from the cases currently pending in the multi-district litigation in federal court in Massachusetts.**

In support of their removal of this case, Dey refers to other cases filed throughout the country involving pharmaceutical pricing issues that have been removed and consolidated in the multi-district litigation in federal court in Boston. *See* Notice of Removal, ¶¶ 43, 45. The removal and consolidation of these cases do not support the removal of Alabama's case. In most of those actions, federal question jurisdiction was based on the assertion of federal claims, such as RICO and breach of federal Medicaid Rebate agreements, or ERISA preemption principles. These cases are unlike Alabama's case wherein only four exclusively state-law claims are asserted and federal claims are disclaimed. *See* Second Amended Complaint, ¶ 95 and p. 32 n.2 ("no federal claims are being asserted in this case.") Consequently, the existence of federal multi-district litigation concerning pharmaceutical pricing issues should not influence this Court's consideration of whether there is federal question jurisdiction over the State of Alabama's claims. *In re Estate of Tabas*, 879 F. Supp. 464, 467 (E.D. Pa. 1995)("An already existing federal action cannot provide a mechanism for removal of a non-removable state-court action.").

**IV.    Even Assuming that Federal Jurisdiction Exists with Respect to the State's Claims Against Dey, This Court May Not Exercise Supplemental Jurisdiction Over the State's Claims Against the Other Defendants.**

Defendants contend that because this Court has original jurisdiction over the State's claims against Dey (which it does not), this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the State's claims against the other Defendants in

27

this action.  In order for this Court to have supplemental jurisdiction over the State's claims against the other Defendants, those claims must be "so related" to the State's claims against Dey that they "form part of the same case or controversy."[5]  *See* 28 U.S.C. § 1367(a).  However, the right of a district court to assume supplemental jurisdiction over a related state claim under § 1367(a) only applies to cases originally filed in the district court and not to cases removed to the district court.  *Reneau v. Oakwood Mobile Homes*, 952 F. Supp. 724, 728 (N.D. Ala. 1997); *Muhammad v. City of Tuskegee*, 76 F. Supp. 2d 1293, 1296 (M.D. Ala. 1999).  Because the State's case was not originally filed in federal court, this Court may not exercise supplemental jurisdiction over the State's claims against the other Defendants.[6]  *Reneau*, 952 F. Supp. at 728 ("The mandatory strict construction of removal statutes absolutely prevents the removal of a state claim *unless it is separate and independent* from a federal claim")(emphasis in original).

**V.    Even Assuming that this Court Could Assume Supplemental Jurisdiction Over the State's Claims Against the Other Defendants, the Court Should Remand those Claims to State Court.**

Even assuming for purposes of argument that 31 U.S.C. § 3732(b) confers original federal jurisdiction over the State's claims against Dey (which it does not) and if (contrary to the rule of strict construction of removal statutes) section 1367(a) should be

---

[5] It is interesting that Defendants assert this legal argument in their Notice of Removal when they so strenuously moved for severance of the claims in the state court proceeding, arguing, in part, that the claims against the various Defendants constituted independent claims not arising from the same transaction or same series of transactions.  *See, e.g.*, Aventis Pharmaceuticals, Inc.'s Motion to Sever or for a Separate Trial, filed September 15, 2006.  Defendants have apparently abandoned that argument now, when they think it serves their purpose in seeking removal to federal court.

[6] Of course, the Court need not even reach this issue because of the procedural deficiencies in Defendants' removal and because no original federal jurisdiction exists over the State's claims against Dey.

construed to allow <u>all</u> tag-along supplementary state claims to be removed, rather than only to be filed originally in the district court, then this Court has discretion to decline to exercise supplemental jurisdiction over the State's claims against the remaining defendants. *See Reneau*, 952 F. Supp. at 728; *Muhammad*, 76 F. Supp. 2d at 1296. Pursuant to 28 U.S.C. § 1367(c):

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
>
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; . . . or
>
> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Here, the State's claims against the remaining defendants substantially predominate over the State's claims against Dey, as the defendants are trying to pile purely state law claims onto a single federal FCA complaint against Dey. In this case, there are 72 named defendants other than Dey, and by sheer numbers alone, the State's claims against those defendants substantially predominate over the claims against Dey. *See De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3[d] Cir. 2003)("Generally, a district court will find substantial predomination where a state claim constitutes the real body of the case, to which the federal claim is only an appendage – only where permitting litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog.")(internal quotation omitted). Additionally, the FCA complaint purports to cover four named drugs sold by

Dey, while Alabama's complaint targets nine drugs sold by Dey (including the four on which the FCA complaint is based).

Moreover, the exercise of supplemental jurisdiction would materially impede both the federal FCA case and Alabama's case, constituting a compelling reason for declining to exercise supplemental jurisdiction. *See Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994)(noting judicial economy, convenience, and fairness to the parties as factors supporting discretionary remand under § 1367(c)); *see also Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002)(remanding state law claims and holding that the factors enumerated in § 1367(c)(2) and (4) were clearly present where only one of forty defendants had grounds for invoking federal court's jurisdiction, claims against other defendants all arose from state law and had been pending in state court for nearly two years, and remaining claims would probably have been transferred to multidistrict litigation panel, where they would not be heard for many years).

## VI.    The State is Entitled to an Award of Attorney Fees and Costs.

28 U.S.C. § 1447(c) provides: "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."   The Supreme Court recently articulated the standard to be applied in determining whether to award costs and expenses pursuant to this statute:

> Absent unusual circumstances, courts may award attorney's fees under 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.  Conversely, when an objectively reasonable basis exists, fees should be denied. In applying this rule, district courts

retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case.

*Martin v. Franklin Cap. Corp.*, 546 U.S. 132 (2005)(internal citations omitted). The Court also noted that while the removal statute represented Congress' intent to "confer a right to remove," it is also designed to "deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party." *Id.*

Here, Dey clearly lacked an objectively reasonable basis for removal. *See Hansard v. Forsyth County*, 2006 WL 1843559, at *2-3 (11th Cir. July 6, 2006)(affirming award of attorney fees on remand where defendants did not have an objectively reasonable basis for removal when the complaint, on its face, did not plead a federal claim and resolution of the state law claims did not necessarily require the resolution of any federal issues). This is particularly true with respect to its position that the federal *qui tam* complaint constitutes an "amended pleading, motion, order, or other paper" within the meaning of 28 U.S.C. § 1446(b). This position has been squarely rejected by the courts, including federal courts that within the last year granted remand motions after removals by Dey and the other defendants in other state Attorney General AWP litigation (including the MDL court in Boston to which Dey seeks to have this case transferred).

The State did nothing to spur the erroneous removal. There has been no change in the parties or the allegations of the State's complaint since the filing of the original, the first amended, or second amended complaint, the last of which occurred on January 26, 2006. Therefore, there has been no action by the State that would suddenly create federal subject matter jurisdiction or allow additional time for the defendants to remove. The

Defendants' actions have caused the State to incur needless litigation costs and efforts, are contrary to the principles of federalism and are frustrating to judicial economy. The awarding of fees is important to deter erroneous removals and to protect the State's right to choose its forum. Because there was no objectively reasonable basis supporting removal, the State should be awarded attorney fees and costs in seeking this remand and opposing the erroneous removal.

## <u>CONCLUSION</u>

Based on the foregoing, Defendants' removal is improper because it is untimely, the unsealed federal *qui tam* action is not an "other paper" under 28 U.S.C. § 1446(b), and this Court lacks subject matter jurisdiction over the action. Therefore, this case should be remanded to the Circuit Court of Montgomery County, Alabama straight away to prevent any further delay or prejudice to the State. Costs and expenses, including attorney fees, should also be awarded to the State.

s/ Troy King_____
TROY KING
ATTORNEY GENERAL

STATE OF ALABAMA
300 State House
11 S. Union Street
Montgomery, Alabama  36130

Email:  tking@ago.state.al.us

s/ Jere L. Beasley_____
Jere L. Beasley (BEA020)
W. Daniel "Dee" Miles, III (MIL060)
Clinton C. Carter (CAR112)
Deputy Attorneys General
BEASLEY, ALLEN, CROW, METHVIN, PORTIS
& MILES, P.C.
P. O. Box 4160
Montgomery, AL  36103-4160
(334) 269-2343
(334) 954-7555 (facsimile)

Email:  jere.beasley@beasleyallen.com
           dee.miles@beasleyallen.com
           clint.carter@beasleyallen.com

s/ Caine O'Rear III_____
Caine O'Rear III (ORE003)
Windy C. Bitzer (BIT005)
Deputy Attorneys General
HAND ARENDALL, L.L.C.
P. O. Box 123
Mobile, AL  36601
(251) 432-5511
(251) 694-6375 (facsimile)

Email:  corear@handarendall.com
           wbitzer@handarendall.com

Roger L. Bates (BAT006)
Deputy Attorney General
HAND ARENDALL, L.L.C.
1200 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
(205) 324-4400
(205) 322-1163 (facsimile)

Email:  rbates@handarendall.com

Attorneys for the State of Alabama

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel. I further certify that I have, on this day, served this pleading to counsel of record through the LexisNexis File and Serve system, pursuant to Case Management Order No. 2.

<u>s/ Caine O'Rear III</u>_____

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of Minnesota, by its Attorney
General, Mike Hatch,                                    Civil No. 05-1394 (PAM/JSM)

                        Plaintiff,

v.                                                    **MEMORANDUM AND ORDER**

Pharmacia Corporation,

                        Defendant.

---

This matter is before the Court on Plaintiff's Motion to Remand and Defendant's Motion to Stay Consideration of the Motion to Remand. For the reasons that follow, Defendant's Motion is denied and Plaintiff's Motion is granted.

**BACKGROUND**

The underlying action has been ongoing since 2002. Plaintiff, the State of Minnesota, filed this action on behalf of Medicare beneficiaries claiming that Defendant Pharmacia Corporation inflated the average wholesale price ("AWP") on prescription drugs, causing Medicare beneficiaries to make inflated Medicare Part B co-payments. The Complaint only alleges state law claims, including violations of the Minnesota Consumer Fraud Act, the False Statement in Advertising Act, the Fraud on Senior Citizens and Handicapped Persons Act, and the Medicaid Fraud Act. It also contains common law claims for fraud and unjust enrichment.

The Complaint was initially filed in Minnesota state court on June 18, 2002, and subsequently removed to federal court on July 18, 2002. In particular, Defendant contended that because Plaintiff's claims require a determination of whether the AWPs used by

EXHIBIT A

Defendant complied with the meaning of AWP under the Medicare statute, federal jurisdiction existed. Before the Court disposed of the motion to remand, the case was transferred by the Multi-District Litigation ("MDL") Panel to In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL 1456 ("MDL Litigation"). Following transfer to the MDL Litigation, the MDL court remanded the action to Minnesota state court. Montana v. Abbott Labs., 266 F. Supp. 2d 250, 255 (D. Mass. 2003).

On June 13, 2005, the United States Supreme Court determined that the relevant question for federal jurisdiction is whether the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 125 S. Ct. 2363, 2368 (2005). This decision clarified the rule in Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804 (1986), by eliminating any requirement that a private federal cause of action exist in order for federal jurisdiction to lie.

On July 13, 2005, Defendant removed this action to this Court. The basis for removal is premised on the Supreme Court's decision in Grable. On July 14, 2005, Defendant filed a Notice of Related Action in the MDL Litigation, designating the case as a tag-along to those like cases already transferred. On August 9, 2005, the MDL Panel issued an order conditionally transferring this action to the MDL Litigation. No final transfer order has been issued.

Defendant first requests that the Court stay a ruling on the Motion to Remand pending

a final order of transfer to the MDL Litigation, so that the MDL court may decide the remand issue in conjunction with other similarly situated state-filed cases. Plaintiff argues that a stay is not warranted and claims that remand is appropriate because Defendant's removal is procedurally defective.

**DISCUSSION**

In this case, the Court is faced with two Motions: a Motion to Remand and a Motion to Stay the Motion to Remand. Defendant argues that a stay is appropriate to allow for a final order of transfer to the MDL Litigation so that the Motion to Remand will be addressed in conjunction with other cases presenting the same legal and factual issues. However, Plaintiff insists that, before the Court may address Defendant's Motion to Stay, the Court must address the threshold issue of subject matter jurisdiction. Indeed, the absence of subject matter jurisdiction renders the Court powerless. Thus, the Court agrees with Plaintiff. See Pennsylvania v. Tap Pharm. Prods. Inc., No. 05-3604, 2005 WL 2242913 (E.D. Pa. Sept. 9, 2005) (in factually and legally identical scenario, the district court found that "granting a stay solely based on the existence of a factually-related MDL proceeding, without undertaking an individualized analysis of subject matter jurisdiction, would run counter to established case law, congressional intent, and [Judicial Panel on Multi-District Litigation] Rule 1.5, all of which contemplate a district court will act to resolve threshold jurisdictional concerns"). In reviewing a motion to remand, the Court must strictly construe the removal statute against the party seeking removal and resolve all doubts as to the propriety of federal jurisdiction in favor of state court jurisdiction. See In re Potash Antitrust Litig., 866 F. Supp. 406, 410 (D. Minn.

3

1994) (Kyle, J.).

## A.    Timeliness

First and foremost, Plaintiff argues that Defendant's Second Notice of Removal is untimely.  In relevant part, 28 U.S.C. § 1446 (b) states:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable . . . .

Indeed, this Second Notice of Removal comes three years after the initial filing of the underlying Complaint.    Defendant contends that the Supreme Court's decision in Grable constitutes "other paper," which allows Defendant thirty days from the issuance of the Grable decision to file this Second notice of Removal. However, the law in Minnesota is clear that "other paper" refers "solely to documents generated within the state court litigation itself." Johansen v. Employee Ben. Claims, Inc., 668 F. Supp. 1294, 1296 (D. Minn. 1989) (McLaughlin, J.).    Thus, under the precedent in this district, and indeed the majority view, the issuance of the Supreme Court decision is irrelevant when determining the timeliness of Defendant's Second Notice of Removal.    Accordingly, Defendant's removal is improper and remand is appropriate.    Id.; see Holiday v. Travelers Ins. Co., 666 F. Supp. 1286, 1289 (W.D. Ark. 1987) ("the court does not 'buy' the proposition that the decision of a court - even the Supreme Court - constitutes 'other papers'" within the meaning of the removal statute); see also Tap Pharm. Prods. Inc., 2005 WL 2242913, at * 8 (concluding that "other paper" does not include opinions from unrelated litigation, and noting that majority of jurisdictions follow this

4

conclusion); Wisconsin v. Abbott Labs., – F. Supp. 2d – , 2005 WL 2407669, at **8-9 (W.D. Wis. Sept. 29, 2005) ("other paper" does not include the recent Grable decision).

Defendant argues that Johansen is not good law and that the Court should disregard its mandate. Although neither the Eighth Circuit nor any other Minnesota District Court has addressed the issue, Johansen has not been overruled. Moreover, it is the majority view. See Tap Pharm. Prods. Inc., 2005 WL 2242913, at *8 n.10. Finally, Defendant's reliance on Green v. R.J. Reynolds Tobacco Co., 274 F.3d 263, 266-68 (5th Cir. 2001) and Doe v. American Red Cross, 14 F.3d 196, 203 (3d Cir. 1993), is misplaced, as both of these cases narrowly hold that a decision in an unrelated case, but involving the same defendant and concerning a similar factual situation and an express grant of removal qualifies as an "order" under § 1446(b), to allow removal. See Green, 274 F.3d at 266-68; Am. Red Cross, 14 F.3d at 203. Indeed, none of these facts are evident here, and accordingly, Defendant's Second Notice of Removal is untimely. Because removal in this instance is procedurally defective, remand is appropriate. See 28 U.S.C. § 1446; see also Mousel v. Knutson Mortg. Corp., 823 F. Supp. 658, 662 (D. Minn. 1993) (MacLaughlin, J.).


**B.    Federal Question**

Even if Defendant's Second Notice of Removal was timely, the Court finds that it nevertheless lacks jurisdiction over Plaintiff's claims. An action may be removed from state court to federal court only if it presents an issue of federal question or if diversity jurisdiction exists. 28 U.S.C. § 1441. Defendant premises removal on federal question jurisdiction.

In <u>Montana v. Abbott Laboratories,</u> the MDL court determined that although Plaintiff's claims presented a federal question, the First Circuit's interpretation of <u>Merrell Dow</u> required remand. Because the Medicare statute does not provide a private cause of action for AWP misreporting, the court concluded that "the federal issue is not substantial enough to create federal jurisdiction." 266 F. Supp. 2d at 257. According to Defendant, because <u>Grable</u> expressly clarified that federal question jurisdiction does not require the existence of a private cause of action, the MDL court's narrow basis for remand no longer exists.

However, Defendant fails to acknowledge that the MDL court further held that <u>Merrell Dow</u> compelled remand. The MDL court specifically rejected Defendant's contention that the prospect of multiple judicial determinations on the meaning of AWP warranted removal. <u>Id.</u> at 257-58 (the lack of a federal cause of action and no preemption of state remedies demonstrate Congress's intent to limit federal question jurisdiction). Indeed, as the <u>Grable</u> court noted, "the combination of no federal cause of action and no preemption of state remedies . . . [is] an important clue to Congress's conception of the scope of jurisdiction to be exercised under § 1331." 125 S. Ct. at 2370. Thus, the MDL court's holding is not as narrow as Defendant contends and further suggests that Plaintiff's claims do not present a substantial federal question, even under <u>Grable</u>.

Even assuming that Plaintiff's claim raises a disputed and substantial federal issue, removal is nevertheless inappropriate under <u>Grable</u>. <u>Grable</u> requires that each case must be examined to determine whether the exercise of federal jurisdiction preserves any congressionally approved balance of federal and state judicial responsibilities. <u>Id.</u> at 2368.

6

The Court is persuaded by the thorough and reasoned analysis of the Western District of Wisconsin, which addressed the same legal and factual dispute:

> [T]here is no strong federal interest in the present case comparable to the federal interest in tax collection implicated in Grable. The federal question raised in Grable was of critical importance to the IRS's efforts to satisfy tax liabilities from the property of delinquent taxpayers. Although a federal agency administers the Medicare program, states play the primary role in apportioning Medicaid benefits within the broad parameters set by federal law. States and the federal government have an interest in securing an interpretation of the Medicare statute and regulations. At best, the federal and state interests are equivalent. Moreover, the fact that Congress has not preempted the states' use of consumer protection statutes to police medical billing practices indicates the absence of a dominant federal interest.
>
> Second, in Grable, the Court was willing to extend federal jurisdiction because quiet title actions under state law rarely raise issues of federal law. By contrast, the present case is one of many that have been filed by states across the country concerning pharmaceutical companies' alleged fraud in price-setting. Shifting all of the cases [] into federal court would work a significant disruption in the division of labor between federal and state courts. [] Finally, the nature of the present case is more analogous to Merrell Dow than Grable. Plaintiff has asserted statutory and common law tort claims that, like the negligence claims in Merrell Dow, rest on alleged violations of federal law. Because this case does not implicate an overriding federal interest and because removal would disturb the balance of judicial responsibilities between state and federal courts, [] removal of this action was improper.

Abbott Labs., – F. Supp. 2d – , 2005 WL 2407669, at *8.

## CONCLUSION

The Court finds that Defendant's Second Notice of Removal was untimely, and accordingly, remand is appropriate. Based on all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion to Remand (Clerk Doc. No. 5) is **GRANTED**;

2.    Defendant's Motion to Stay Consideration of the Motion to Remand (Clerk Doc. No. 11) is **DENIED**;

3.    This case is **REMANDED** to Hennepin County District Court.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 22, 2005

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge

06-21303-W-6old

OAO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | DATE May 26, 2006    1000 hrs | |
| NAME OF SERVER (PRINT) Curtis L. Collison III | TITLE Special Agent | |

*Check one box below to indicate appropriate method of service*

☒ Served personally upon the defendant. Place where served: CT Corporation, 1200 S. Pine Island Rd, Plantation, FL 33324 as Registered Agent

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL 0.00 |

DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  5/26/06
             Date

Signature of Server

8100 Oak Ln, #306, Miami Lakes, FL 33016
Address of Server

2006 JUN -7 AM 10: 01

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

EXHIBIT B

OAO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

SOUTHERN _____  District of   FLORIDA _____

UNITED STATES OF AMERICA, ex. rel.,

**SUMMONS IN A CIVIL CASE**

V.

ABBOTT LABORATORIES; and HOSPIRA, INC.,
et. al.,

CASE NUMBER:   **06–21303–CIV–GOLD**

TO: (Name and address of Defendant)

**Abbott Laboratories, Inc.**
**1 Abbott Park Road**
**Abbott Park, IL  60064-3500  by service upon its registered agent:**

**CT Corporation**
**1200 S. Pine Island Road**
**Plantation, FL  33324**
    YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Mark A. Lavine, Assistant United States Attorney
United States Attorney's Office
99 N.E. 4th Street, Suite 300
Miami, Florida  33132

an answer to the complaint which is served on you with this summons, within _____ 20 days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

Clarence Maddox

CLERK _____

(By) DEPUTY CLERK

DATE   **MAY 2 5 2006**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                    CIVIL ACTION NO. 06-21303-GOLD
*ex rel.*

    VEN-A-CARE OF THE
    FLORIDA KEYS, INC.


                      Plaintiff,

    v.

ABBOTT LABORATORIES, *et al.*

                      Defendants.

_____/


## ATTACHMENT TO SUMMONS


1.A    United States' Notice of Election to Intervene in Part and to Decline to Intervene in Part;

1.B.    Order on United States' Notice of Election to Intervene in Part and to Decline to Intervene in Part;

1.C.    United States' Complaint;

1.D.    United States' Motion to Sever as to Defendant Abbott Laboratories, Inc.;

1.E.    Order on United States' Motion to Sever as to Defendant Abbott Laboratories, Inc.

**Sealed**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA <br> _ex rel._ | ) <br> ) <br> ) | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |
| VEN-A-CARE OF THE <br> FLORIDA KEYS, INC. <br> a Florida Corporation, <br> by and through its principal <br> officers and directors, <br> ZACHARY T. BENTLEY and <br> T. MARK JONES, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 06 - 21303 - CIV - ASG |
| Plaintiff, | ) <br> ) | |
| vs. | ) <br> ) | |
| ABBOTT LABORATORIES, INC., | ) <br> ) | |
| Defendant. | ) <br> ) | |

### THE GOVERNMENT'S NOTICE OF ELECTION TO INTERVENE IN PART AND TO DECLINE TO INTERVENE IN PART

Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4), the United States

notifies the Court of its decision to intervene in part of _United States ex rel. Ven-A-Care v._

_Abbott, et al.,_ Civil Action No. 95-1354-CIV-GOLD (the action), and to decline to intervene in

part of the action. The United States intervenes in that part of the action which alleges Medicaid

and Medicare fraud with respect to Abbott Laboratories, Inc. (Abbott) for the following drugs

and Healthcare Common Procedural Coding System (HCPCS) billing codes:

| **DRUG** | **NDC#** |
|---|---|
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |



CIVIL ACTION NO: 95-1354-CIV-GOLD

| | |
|---|---|
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792323 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |

| HCPCS | Description |
|---|---|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

| | |
|---|---|
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

The United States declines to intervene in that part of the action against Abbott as to all other drugs or HCPCS codes identified in this action. The United States is filing its complaint against Abbott along with this intervention notice.

Although the United States declines to intervene in a portion of the action against Abbott, we respectfully refer the Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the declined portion of the action against Abbott in the name of the United States; providing, however, that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Id. Therefore, the United States requests that, should either the relator or the defendant propose that the part of the action against Abbott in which the United States has not intervened be dismissed, settled, or otherwise discontinued, this Court solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States requests that all pleadings filed in this action, even as to the non-intervened part of this action against Abbott, be served upon the United States; the United States also requests that all orders issued by the Court be sent to the Government's counsel. The United States reserves its right to order any deposition

3

CIVIL ACTION NO: 95-1354-CIV-GOLD

transcripts and to intervene in the portion of this action against Abbott in which it is declining to

intervene today, for good cause, at a later date.

Finally, the United States requests that a redacted copy of the relator's complaint[1]

identifying all of its Medicaid and Medicare claims against Abbott, this Notice, and the attached

proposed Order be unsealed. The United States requests that all other papers on file in this action

remain under seal because in discussing the content and extent of the United States' investigation,

such papers are provided by law to the Court alone for the sole purpose of evaluating whether the

seal and time for making an election to intervene should be extended.

A proposed order accompanies this notice.

DATED this ___/7th___ day of March, 2006.


Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
MARK A. LAVINE
ANA MARIA MARTINEZ
JEFFREY DICKSTEIN
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, FL  33132
Phone:  (305) 961-9003

---

[1] Relator is filing a redacted version of its complaint at the same time this notice is being filed.

4

CIVIL ACTION NO: 95-1354-CIV-GOLD

Fax: (305) 536-4101
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov

MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

5

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this _____ day of March, 2006 to:

James J. Breen
Alison Simon
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, FL 33029-7470

ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD    06CU-21303-A-89

UNITED STATES OF AMERICA
ex rel.

    VEN-A-CARE OF THE
    FLORIDA KEYS, INC.
    a Florida Corporation,
    by and through its principal
    officers and directors,
    ZACHARY T. BENTLEY and
    T. MARK JONES,

        Plaintiff,

vs.

ABBOTT LABORATORIES, INC.
and HOSPIRA, INC.,

        Defendants.
_____/



FILED by _____ D.C.

MAY 1 6 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**ORDER ON UNITED STATES' NOTICE OF ELECTION TO INTERVENE IN PART
AND TO DECLINE TO INTERVENE IN PART**

    The United States having intervened in part of this action and having declined to intervene

in part of this action pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4), the Court

rules as follows:

    IT IS ORDERED that,

    1.  The following pleadings are hereby unsealed:

        A.    United States' Notice of Election to Intervene in Part and to Decline to
            Intervene in Part;

        B.    This Order on United States' Notice of Election to Intervene in Part and to
            Decline to Intervene in Part;

REC'D by _____ D.C.

MAY 1 8 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI



CIVIL ACTION NO: 95-1354-CIV-GOLD

C.    United States' Complaint;

D.    United States' Motion to Sever as to Defendant Abbott Laboratories, Inc.

E.    Order on United States' Motion to Sever as to Defendant Abbott
Laboratories, Inc.

F.    Relator's Motion For Leave to Amend Complaint by Adopting United
States' Complaint to Intervene

G.    Court's Order granting Relator's Motion For Leave to Amend Complaint
by Adopting United States' Complaint to Intervene.

H.    Copies of the Relator's prior complaints redacted to disclose only that
information pertinent to the allegations against Abbott (including Relator's
previously filed Relator's Redacted Fourth Amended Complaint as to
Defendant Abbott Laboratories and Notice of Filing thereof);

2.  The United States shall serve upon Defendants Abbott Laboratories, Inc. and Hospira,
Inc., the pleadings identified in paragraph 1.A., 1.B., 1.C., 1.D. and 1.E. of this order by ~~July 15~~ September 15, 2006 ~~2006~~, in accordance with Fed. R. Civ. P. 4; and

3.  All other papers or Orders on file or to be filed in Case No. 95-1354-CIV-GOLD shall
remain under seal pending further order of the Court;

DONE AND ORDERED in Chambers at Miami, Florida, this _15_ day of _Sep_,
2006.

_____
ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

cc:

Mark A. Lavine
U.S. Attorney's Office
99 N.E. 4th st.
Miami, FL 33132
Fax: (305) 536-4101

James J. Breen
Alison Simon
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, FL 33029-7470
Fax:(954) 874-1705

Gejaa T. Gobena
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
Fax: (202) 307-3852

**Sealed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> ex rel. | ) <br> ) <br> ) | **FILED <u>IN CAMERA</u> AND UNDER** <br> **SEAL PURSUANT TO** <br> **31 U.S.C. § 3730** |
| VEN-A-CARE OF THE <br> FLORIDA KEYS, INC. <br> a Florida Corporation, <br> by and through its principal <br> officers and directors, <br> ZACHARY T. BENTLEY and <br> T. MARK JONES, <br> Plaintiff, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 06 - 21303 · CV - ASG |
| vs. | ) <br> ) | |
| ABBOTT LABORATORIES, INC., <br> Defendant. | ) <br> ) <br> ) <br> ) | |

<u>**COMPLAINT**</u>

The United States brings this fraud action against Abbott Laboratories, Inc. and Hospira,

Inc. (collectively "Abbott") to recover losses sustained by the Medicare and Medicaid programs.

Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew

Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical

products. Abbott's actual sales prices for its pharmaceutical products were far less than the

prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than

Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and

profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool,

actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and

(2) its actual sales prices as an inducement to its customers. These efforts allowed Abbott to

increase its profits by boosting sales for its drugs.

CIVIL ACTION NO: 95-1354-CIV-GOLD

## I. NATURE OF ACTION

1.     The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.     The United States bases its claims on Abbott having caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2).

3.     Within the time frames detailed below, Abbott engaged in a fraudulent scheme that caused the Medicare and Medicaid programs to pay excessive reimbursement to Abbott's customers, *e.g.*, pharmacies, physicians, hospitals, home health agencies, nursing homes, home infusion companies, clinics and physicians (hereafter referred to collectively as "Customers"). In furtherance of this scheme, Abbott reported false, fraudulent and inflated drug prices for certain drugs (listed in ¶¶ 31 and 35 below) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Abbott's customers. A chart setting out examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**. Abbott knew that the Medicare and Medicaid programs relied on Abbott's reported prices to those compendia to set reimbursement rates for claims submitted for Abbott's drugs. Abbott then sold the drugs for far lower prices, and marketed to existing and potential Customers the government-funded "spread" between the inflated reimbursement amounts and the actual acquisition costs of the

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

drugs to boost its sales and profits.

4.     Abbott knew that its false price reporting and marketing efforts would cause its Customers to submit claims for fraudulently inflated Medicaid and Medicare reimbursement.

5.     Abbott's fraudulent scheme to induce Customers to purchase its products by ensuring that federal reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law and numerous state laws.

6.     To get fraudulent claims paid by the United States, Abbott also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

7.     The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

## II. JURISDICTION

8.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over Abbott pursuant to 31 U.S.C. § 3732(a) because Abbott resides or transacts business in the Southern District of Florida.

## III. VENUE

9.     Venue is proper in the Southern District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Abbott resides or transacts business in this District.

3

CIVIL ACTION NO: 95-1354-CIV-GOLD

## IV. PARTIES

10.     The United States brings this action on behalf of the Department of Health and

Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly

known as the Health Care Financing Administration), which administer the Medicare and

Medicaid programs.

11.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation

organized under the laws of Florida, with its principal offices in Key West, Florida. Ven-A-Care

is a pharmacy licensed to provide the prescription drugs specified in this Complaint and has

been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.

Ven-A-Care's principal officers and directors include John M. Lockwood, M.D., Zachary

Bentley and T. Mark Jones, who are each citizens of the United States and reside in Key West,

Florida. The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a lawsuit on

behalf of the United States to recover damages for false claims. Ven-A-Care brought this action

against Abbott on behalf of itself and the United States.

12.     Defendant Abbott is a corporation organized under the laws of Illinois with its

principal offices in Abbott Park, Illinois. At all times material to this civil action, Abbott has

transacted business in the Southern District of Florida by selling and distributing its drugs,

including but not limited to those identified in this Complaint, to purchasers within the Southern

District of Florida.

13.     Defendant Hospira, Inc. ("Hospira") is a corporation organized in 2003 under the

laws of Illinois with its principal offices in Abbott Park, Illinois. At all times material to this

4

CIVIL ACTION NO: 95-1354-CIV-GOLD

action, Hospira has transacted business in the Southern District of Florida by selling and

distributing its drugs, including but not limited to those identified in this Complaint, to

purchasers within the District of Southern District of Florida.  The Abbott drugs at issue in this

action were manufactured by Abbott's Hospital Products Division ("HPD") until 2004, when

Abbott spun off the HPD as a separate corporate entity, Hospira.

## V.  THE LAW

### A.    The False Claims Act

14.    The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an
> officer or employee of the United States Government or a member of the Armed
> Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government
>
> \* \* \*
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person . . . .
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information
> (1) has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

15.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as

amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64

Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for

5

CIVIL ACTION NO: 95-1354-CIV-GOLD

violations occurring on or after September 29, 1999.

**B.    The Federal Anti-Kickback Statute**

16.    Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to protect the integrity of Medicare and Medicaid. Congress strengthened the statute in

1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would

not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b)

and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L.

No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

17.    The anti-kickback statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under Medicare and Medicaid. In pertinent part,

the statute provides:

> (b) Illegal remuneration
>
>> (1) whoever knowingly and willfully solicits or
>> receives any remuneration (including any kickback,
>> bribe, or rebate) directly or indirectly, overtly or
>> covertly, in cash or in kind –
>>
>>> (A) in return for referring an individual to a
>>> person for the furnishing or arranging for the
>>> furnishing of any item or service for which
>>> payment may be made in whole or in part
>>> under a Federal health care program, or
>>>
>>> (B) in return for purchasing, leasing,
>>> ordering, or arranging for or recommending
>>> purchasing, leasing, or ordering any good,

CIVIL ACTION NO: 95-1354-CIV-GOLD

> facility, service, or item for which payment
> may be made in whole or in part under a
> Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

> (2) whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind
> to any person to induce such person --

> (A) to refer an individual to a person for the
> furnishing or arranging for the furnishing of any
> item or service for which payment may be made in
> whole or in part under a Federal health care
> program, or

> (B) to purchase, lease, order or arrange for or
> recommend purchasing, leasing or ordering any
> good, facility, service, or item for which payment
> may be made in whole or in part under a Federal
> health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Those who violate the statute also are subject to exclusion from

participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of up to $50,000 per violation and up to three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

CIVIL ACTION NO: 95-1354-CIV-GOLD

## VI. THE FEDERAL HEALTHCARE PROGRAMS

18.     Medicaid and Medicare were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

### A.     The Medicaid Program

19.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

20.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. § 1396a.

21.     The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50%, and as high as 83%.

22.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

23.     The Medicaid programs of all states reimburse for prescription drugs.

24.     The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

25.     By becoming a participating supplier in Medicaid, suppliers agree to

CIVIL ACTION NO: 95-1354-CIV-GOLD

abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.    The Medicare Program**

26.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. 42 U.S.C. §§ 426-426a, 1395o.

27.    HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and directly administers the Medicare program. The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

28.    Medicare Part B generally covers drugs which are provided either: (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (*e.g.*, certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit. 42 C.F.R. §§ 405.517, 414.701.

29.    During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the Contractors act on behalf of CMS. 42 C.F.R. § 421.5(b).

CIVIL ACTION NO: 95-1354-CIV-GOLD

30.    Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers. Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

**C.    Drug Reimbursement Under Medicaid and Medicare**

31.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution. 21 U.S.C. § 355. The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC"). FDA has assigned approximately 170,000 NDCs to drug products. The drugs and corresponding NDCs at issue in this case are listed below:

| DRUG | NDC# |
| --- | --- |
| Sodium Chloride Injection | 00074196607 |
| Water for Injection 30 ml | 00074397703 |
| Vancomycin HCl 500 mg | 00074433201 |
| Water for Injection 10 ml | 00074488710 |
| Water for Injection 20 ml | 00074488720 |
| Sterile Water for Injection | 00074488750 |
| Sodium Chloride Injection | 00074488810 |
| Sodium Chloride Injection | 00074488820 |
| Sodium Chloride Irrigation | 00074613802 |
| Sodium Chloride Irrigation | 00074613803 |
| Sodium Chloride Irrigation | 00074613822 |
| Sterile Water for Irrigation | 00074613902 |
| Sterile Water for Irrigation | 00074613903 |
| Sterile Water for Irrigation | 00074613922 |
| Vancomycin HCl 5 gm | 00074650901 |
| Vancomycin HCl 1 gm | 00074653301 |
| Vancomycin HCL 500 mg Add-Vantage | 00074653401 |
| Vancomycin HCl 1 gm Add-Vantage | 00074653501 |
| 5% Dextrose in Water 50 ml | 00074710013 |

10

CIVIL ACTION NO: 95-1354-CIV-GOLD

| | |
|---|---|
| 5% Dextrose in Water 100 ml | 00074710023 |
| Sodium Chloride Injection | 00074710102 |
| Sodium Chloride 0.9% 50ml | 00074710113 |
| Sodium Chloride 0.9% 100 ml | 00074710123 |
| Dextrose Injection | 00074712007 |
| Sodium Chloride Irrigation | 00074713809 |
| Sterile Water for Irrigation | 00074713909 |
| Dextrose 5%/ Kcl/NaCl 1000 ml | 00074790209 |
| Dextrose Injection | 00074792202 |
| 5% Dextrose in Water 500 ml | 00074792203 |
| 5% Dextrose in Water1000 ml | 00074792209 |
| Dextrose Injection | 00074792336 |
| Dextrose Injection | 00074792337 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792409 |
| Dextrose 5% and 0.225% NaCL Injection | 00074792609 |
| 5% Dextrose/ NaCl 0.9% 1000 ml | 00074794109 |
| Sodium Chloride Irrigation | 00074797205 |
| Sterile Water for Irrigation | 00074797305 |
| Sodium Chloride 0.9% 250 ml | 00074798302 |
| Sodium Chloride 0.9% 500 ml | 00074798303 |
| Sodium Chloride 0.9% 1000 ml | 00074798309 |
| Sodium Chloride Injection | 00074798436 |
| Sodium Chloride Injection | 00074798437 |
| Sodium Chloride Injection | 00074798509 |
| Water for Injection1000 ml | 00074799009 |

32.    Drug manufacturers, such as Abbott, have not typically submitted claims for reimbursement to federal health care programs. Instead, Abbott marketed its products to its Customers, who then purchased the product either directly or through wholesalers based on a price the customers negotiated with Abbott. In addition to using wholesalers, Customers also purchased Abbott products through group purchasing organizations ("GPO"), who negotiated prices on behalf of Abbott's Customers.

33.    Abbott's Customers then submitted claims for payment for Abbott products to Medicare and Medicaid after dispensing or administering the Abbott drug.

11

CIVIL ACTION NO: 95-1354-CIV-GOLD

34.    For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

35.    The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs. The HCPCS which utilizes 5-digit alphanumeric codes to identify and bill for medical products and supplies. The codes at issue here are listed below:

| HCPCS | Description |
|-------|-------------|
| J2912 | Sodium Chloride, .9 percent, per 2 ml |
| J3370 | Vancomycin HCl, 500 mg |
| J7030 | Normal Saline Solution, 1000 cc |
| J7040 | Normal Saline Solution, 500 ml |
| J7042 | 5 percent Dextrose/Normal Saline Solution, 500 ml |
| J7050 | Normal Saline Solution, 250 cc |
| J7051 | Sterile Saline or Water, up to 250 cc |
| J7060 | 5 percent Dextrose/Water, 500 ml |
| J7070 | D-5-W, 1000 cc |
| J7110 | Dextran 75, 1000 ml |
| J7130 | Hypertonic Saline Solution, 50 or 100 mEq, 20 cc vial |

36.    During the relevant period, Abbott usually reported prices to various price publishers and services on an annual basis. The price publishers used the information to publish pricing compendia.

37.    The reimbursement amounts for claims submitted by Abbott's Customers were directly influenced by Abbott's false price representations. The information contained in the published pricing compendia was used by most third party payor insurance companies, including the Medicare and Medicaid programs, in determining the reimbursement rates for prescription drugs. Abbott documents show that Abbott knew of the impact of its price representations on government reimbursement on claims submitted by its Customers for its drugs. Abbott

12

CIVIL ACTION NO: 95-1354-CIV-GOLD

documents also show that the company actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

38.    No governmental payor knew of or sanctioned Abbott's conduct as set forth in this Complaint, i.e., its deliberate manipulation of its published prices for certain of its products to induce its Customers to purchase those products.

**D.    Medicaid Reimbursement Formulas**

39.    When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public. To determine the EAC for a covered drug, State Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS. 42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

40.    While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states, (b) the maximum allowable cost ("MAC") set by the state Pharmaceutical Reimbursement Boards, or (c) the providers' usual and customary charge. For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits. 42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

41.    The states' methodology for arriving at EAC includes:

A.    discounting a percentage off of the Average Wholesale Price ("AWP");

B.    adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

13

CIVIL ACTION NO: 95-1354-CIV-GOLD

C.    requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

42.    AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail Customer who then administers it to a patient. WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail Customer.

43.    While the majority of states use published AWPs to calculate reimbursement, approximately nine states (Alabama, Arkansas, Colorado, Florida, Maryland, Massachusetts, Ohio, Rhode Island, and Texas) use the wholesale acquisition cost ("WAC") to set the EAC.

44.    The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide. Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

45.    In addition to relying on the manufacturers' reported prices as published in the Price Publications, some State Medicaid programs also received price representations directly from manufacturers, and relied on these representations to confirm the accuracy of the figures they use to determine state reimbursement amounts. For example, the State of Texas required drug companies to submit their prices directly to the Texas Medicaid program in a signed

14

CIVIL ACTION NO: 95-1354-CIV-GOLD

certification attesting to the accuracy of the price information.

### E. Medicare Reimbursement Formulas

46.     From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug. 42 C.F.R. § 405.517 (1992-1998). In general, Medicare relied on median AWPs to set reimbursement rates.

47.     From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug. Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

48.     From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug. 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

49.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment. If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

50.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

CIVIL ACTION NO: 95-1354-CIV-GOLD

## VII. ABBOTT'S SCHEME

51.    From at least on or before January 1, 1991, and continuing through January 2001, Abbott defrauded the United States by knowingly causing the Medicare and Medicaid programs to pay false or fraudulent claims for dextrose solutions, sodium chloride solutions, sterile water, and Vancomycin.

52.    The specific dextrose solutions, sodium chloride solutions, sterile water, and Vancomycin products at issue herein are identified by NDC or HCPCS Code in ¶¶ 31 and 35 above and are hereinafter referred to jointly as the "Drugs."

53.    Dextrose solutions, sodium chloride solutions, and sterile water are generic, water-based solutions used to facilitate the intravenous infusion of other drugs and for fluid replacement, and are commonly referred to as large volume parenterals ("LVPs").

54.    Vancomycin is a powerful, intravenous antibiotic that Abbott has sold as a generic drug since 1988.

55.    Abbott marketed and sold its products, including the Drugs, to Customers.

56.    The Customers purchased the products either directly from Abbott, through a GPO contract or through wholesalers.

57.    The amount paid by a Customer was typically based on a price negotiated with Abbott or the GPO.

58.    Regardless of the method of purchase, Abbott's Customers submitted claims for payment to Medicare and Medicaid when an Abbott product was administered to a program beneficiary. The claims submitted by Abbott's Customers were paid at amounts directly

16

CIVIL ACTION NO: 95-1354-CIV-GOLD

influenced by Abbott's false and fraudulent prices.

59.    Abbott routinely disseminated false pricing information for the Drugs to the

Pricing Publications.  Abbott employees typically reported the false and fraudulent prices to the

Price Publications annually, although it was sometimes done more often.  On most occasions,

Abbott reported inflated "List Prices" or "Direct Prices" (both referred to hereinafter as DP),

WACs and/or AWPs.  A DP is supposed to reflect the price paid by a Customer that buys drugs

directly from Abbott and not through a wholesaler.

60.    When Abbott reported a DP, some Price Publications (*e.g.*, *Blue Book*, which

provided pricing information for the vast majority of the state Medicaid programs) calculated

Abbott's AWPs by applying a markup – usually 18.75% – to the DPs.  Abbott was aware of how

the Price Publications set its AWPs and knew (1) that the markup remained constant and (2) that

its DPs ultimately controlled the AWP reported by the Price Publications for many of its

products.  Abbott reported WACs for several of its drugs as well, but during the time period

covered by the Complaint, the Price Publications used Abbott's DPs (plus the standard markup)

to set the AWPs used by the Medicaid and Medicare programs.

61.    In some circumstances, Abbott itself calculated and supplied the AWP which it

sought to have published.

62.    For example, in a January 16, 1996 letter from Abbott's Reimbursement Manager

to Medi-Span, Abbott directly reported AWPs for two of its products.

63.    Abbott documents also confirm its knowledge that the DPs it reported directly

impacted the AWP.  In a March 20, 1995 e-mail between Abbott employees regarding the

CIVIL ACTION NO: 95-1354-CIV-GOLD

reporting of new Vancomycin DPs, one employee notes, "Please notify Red Book and Medi-Span of these changes ASAP. They are the sources for creating the AWP that is important to [Abbott's] Alternate Site [sales division]."

64.     Abbott also submitted false and fraudulent prices directly to state Medicaid programs. In an October 1, 1997, Abbott "Medicaid Coordinator" Tena Brown represented in a letter to the State of Texas Medicaid Program that the price on Abbott's Vancomycin 1 GM Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM FTV") was $583.70 for a package of 10, or $58.37 a unit. That led the Texas Medicaid program to set reimbursement for Vancomycin 1 GM FTV at that price ($58.37 a unit). At the time, a Customer could purchase Vancomycin 1 GM FTV for $5.53 per unit through a GPO called Oncology Solutions.

65.     With extremely few exceptions, Abbott reported increasingly higher prices for the Drugs from at least on or before January 1, 1991 through 2001. At the same time, the prices Abbott actually charged to its Customers decreased or remained the same.

66.     Abbott knew that the prices which it reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid and Medicare programs. As Abbott's Manager for Reimbursement noted in an April 26, 1995 memorandum, "[h]aving a published [DP] that is high allows a provider to bill at that list price." The false or fraudulent prices Abbott reported to the Price Publications inflated government reimbursement amounts on claims submitted by Abbott's Customers for the Drugs. A chart setting out some examples showing the difference between the prices at which Abbott actually sold its drugs and the false prices reported by Abbott is attached hereto as **Exhibit 1**.

18

CIVIL ACTION NO: 95-1354-CIV-GOLD

67.     Abbott manipulated its DPs, AWPs and WACs to induce its Customers to purchase Abbott's products, including the Drugs, by marketing the resulting huge profits to its Customers.

68.     Neither the Medicaid nor the Medicare programs knew of or sanctioned Abbott's conduct as set forth in this Complaint, *i.e.*, the deliberate manipulation of its published prices to induce its Customers to purchase the Drugs.

**A.     Vancomycin**

69.     Abbott first introduced its generic Vancomycin in 1988.  Abbott's scheme to defraud the United States by causing inflated Vancomycin reimbursements ran from approximately 1989 through 2001.  Over that time period, Medicare and Medicaid paid in excess of $75 million for Abbott's Vancomycin.

70.     During that time period, Abbott reported increasingly higher DPs and AWPs for Vancomycin to the Price Publications while the actual contract prices at which Abbott sold Vancomycin to its Customers decreased significantly.

71.     Abbott sold its Vancomycin in several doses and forms.  The Vancomycin 1 GM FTV was the most common dose of Vancomycin reimbursed by Medicare and Medicaid. Abbott's false and fraudulent price reporting on its Vancomycin 1 GM FTV represents how Abbott reported false and fraudulent prices on its other Vancomycin products.

72.     When Abbott first introduced its Vancomycin 1 GM FTV in 1988, the published per unit AWP was $25.20.  By early 2001, Abbott reported false prices that drove the AWP for Vancomycin 1 GM FTV to $76.42.  At the same time, the price at which Abbott's Vancomycin

CIVIL ACTION NO: 95-1354-CIV-GOLD

was widely available to purchasers decreased to under $4.00 by early 2001; the difference (and

potential profit) between the reported price and the actual selling price for Vancomycin 1 GM

FTV was as great as $72.42 a dose, or more than 18 times the actual price at which Abbott sold

Vancomycin 1GM FTV.

73.     Abbott fully controlled and manipulated the AWPs for Vancomycin 1 GM FTV to

boost its Vancomycin sales at the expense of third party payors, including Medicare and

Medicaid.

74.     Abbott's manipulation of its reported Vancomycin prices between 1989 and 2001

created spreads sufficient to induce increased sales of that drug. Internal memoranda from senior

Abbott sales staff reveal that Abbott actively knew about and marketed the large spreads on

several of its drugs, including Vancomycin. Those efforts proved successful; the percentage of

Abbott's Vancomycin sales reimbursed by Medicaid increased from less than 10% in 1991 to

approximately 70% in 2000.

75.     Abbott's reporting of Vancomycin prices in 1995 exemplifies the manner in

which Abbott manipulated the price of Vancomycin to maintain and grow its market share. In

March 1995, Abbott temporarily reported dramatically lower DPs and AWPs for Vancomycin.

Prior to the March 1995 DP/AWP price change, the Price Publications listed a per unit DP of

$50.90 for Abbott's Vancomycin 1 GM FTV, and a per unit AWP of $60.44 for that drug.

76.     In late March 1995, Abbott reported a new DP of $15.00 for a unit of Vancomycin

1 GM FTV. Based on this new information from Abbott, the Price Publications published

revised per unit prices for Vancomycin 1 GM FTV. They reported a DP of $15.00 and an AWP

20

CIVIL ACTION NO: 95-1354-CIV-GOLD

of $17.81.

77.    Abbott received numerous complaints from Customers over the resulting

decrease in the spread. Abbott deliberated internally on whether and by how much Abbott

should again increase its spread so that it could reestablish the inducement that had come to be

expected by its Customers. Abbott documents show Abbott's pricing personnel carefully

considering the additional profits they could generate for Abbott's Customers if they artificially

re-inflated the reported prices for Vancomycin 1 GM FTV at various levels.

78.    Abbott subsequently reversed its earlier decision to lower its reported prices and

instead raised its reported Vancomycin prices. In early May 1995, Abbott reported a new per

unit DP for its Vancomycin 1 GM FTV of $32.95. The revised AWP for Abbott's Vancomycin 1

GM FTV became $39.13 (once the Price Publication applied the standard markup).

79.    That reported price increase proved insufficient. Later that same month (May

1995), Abbott reported yet another set of prices for Vancomycin. The DP Abbott reported for its

Vancomycin 1 GM FTV rose to $52.94 and its AWP rose to $62.86 (once the Price Publication

applied the standard markup).

80.    Thereafter, Abbott reported higher Vancomycin DPs and AWPs to the Publishers

each year, despite decreases in its actual prices to Customers for Vancomycin over that same

period. The AWP for Abbott's Vancomycin 1 GM FTV peaked at $76.42 per unit in early 2001

at the same time that the actual sales price was less than $4 per unit.

81.    The false prices reported by Abbott directly impacted the amount Medicaid and

Medicare reimbursed for Vancomycin. For example, in 1999 Abbott's Vancomycin 1 GM FTV

21

CIVIL ACTION NO: 95-1354-CIV-GOLD

was widely available for approximately $4.75 a unit. Yet, Abbott reported a per-unit

Vancomycin DP in 1999 – which served as the baseline for determining the AWP – to First

DataBank of $64.35. As a result, the 1999 AWP for Vancomycin 1 GM FTV was set at $76.42.

82.    New York State's Medicaid program relied on the First DataBank prices to set its

reimbursement rate for the Vancomycin 1 GM FTV. New York State's Medicaid reimbursement

rate for the Vancomycin 1 GM FTV in 1999 was $68.77; the AWP for Vancomycin 1 GM FTV

was $76.42 at the time. New York's reimbursement for Vancomycin 1 GM FTV was AWP

minus 10%, a reimbursement formula generally similar to those of other states. Abbott's false

price representations created a profit spread of approximately $64.02 for Abbott's Customers, on

a drug that Abbott sold to those same Customers for approximately $4.75 a unit. The spread

between the New York state Medicaid reimbursement for Vancomycin 1 GM FTV – directly

influenced by Abbott's false price reporting – and the actual acquisition cost was 1,348%. The

profit to Abbott's Customers was 13.5 times the typical acquisition cost for the drug.

83.    Abbott's practice of price manipulation continued into early 2001. At that time,

Abbott reported new, lower WACs to the Price Publications for many of its drugs, including

Vancomycin, without also reporting new DPs or AWPs. At the time Abbott submitted the new

prices in early 2001, it had been under investigation by the Government for pricing fraud; in

October 2001, an Abbott joint venture, TAP Pharmaceuticals, Inc. paid $875 million to the

Government to resolve its criminal responsibility and civil liability for fraudulent pricing and

kickbacks in connection with the marketing of a drug called Lupron. When Abbott submitted

reduced WACs, First DataBank changed the way it calculated Abbott's AWP. First Databank

CIVIL ACTION NO: 95-1354-CIV-GOLD

personnel set new AWPs for Abbott products by applying a 25% markup to the newly supplied

WACs instead of setting Abbott's AWPs by applying a 18.75% markup to Abbott's still inflated

DPs. Abbott tried to convince First DataBank personnel not to set Abbott's AWP by reference to

these new, lower WACs; Abbott wanted First DataBank to continue to use Abbott's then still

inflated DPs to maintain its inflated AWPs. First DataBank refused Abbott's request.

84.    The switch to using the lowered WACs drastically dropped Abbott's reported

AWPs in 2001. For Abbott's Vancomycin 1 GM FTV, the AWP dropped from $76.42 per unit in

early 2001 (when AWP was determined using the inflated DPs) to $17.72 per unit in 2001 (when

AWP was set using the revised, lowered WACs). By 2002, the AWP for this product was down

to $6.06 a unit.

85.    As a result of the drop in AWP, the spread on the reimbursement by Medicare and

Medicaid was reduced from $60-$70 a unit to approximately $2.00 a unit.

86.    Abbott's Customers recognized that Abbott was responsible for creating and

maintaining the spread. Numerous Customers complained to Abbott or the group purchasing

organizations (GPOs) who negotiated prices on behalf of Abbott's Customers. A large Customer

of Abbott went so far as to demand restitution for the almost $10.5 million in lost profits due to

the decrease in spread resulting from Abbott's 2001 submission of lowered prices to the

reporting agencies.

87.    Internal memoranda from senior Abbott sales staff reveal that Abbott actively

knew about and marketed the large spreads on several of its drugs, including Vancomycin, as an

inducement to purchase Abbott's drugs.

23

CIVIL ACTION NO: 95-1354-CIV-GOLD

88.    Abbott's share of the Medicaid market has dropped steadily since the more accurate prices started being published in 2001 and thereafter from approximately 70% in early 2001 to approximately 20% in 2004.

**B.    Large Volume Parenterals**

89.    In addition to false price reporting for Vancomycin, Abbott engaged in similar conduct with respect to its LVPs.

90.    LVPs are essentially sterile water, usually mixed with either salt (sodium chloride) or sugar (dextrose). LVPs are cheap to produce and are sold at very low prices.

91.    One of the most commonly utilized Abbott LVPs was 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 ("5% Dextrose 500 ml").

92.    In 1993, Abbott's 5% Dextrose 500 ml could be widely purchased for as little as $1.80 for a 500ml bag.

93.    The Red Book AWP for 5% Dextrose 500 ml in 1993 was $8.72.

94.    Two years later, in 1995, the price for Abbott's 5% Dextrose 500ml was widely available for even less; one wholesaler was selling it at $1.50 for a 500 ml bag.

95.    During the same two year period from 1993 to 1995 that the actual prices dropped, Abbott twice reported higher prices to the Price Publications for 5% Dextrose 500 ml. The AWP – based on Abbott's representations – increased by 5% in 1994 to $9.16 and was increased by an additional 3% in 1995 to $9.43.

96.    Thus, while Abbott's price to the wholesaler dropped by 20% between 1993 and 1995 (from $1.80 to $1.50), Abbott caused its AWP to increase by 8%. By 1995, the spread

CIVIL ACTION NO: 95-1354-CIV-GOLD

between the AWP and the resale price of that wholesaler was 628%.

97.    Abbott sold these products directly to Customers at prices comparable to those offered by the wholesaler.

98.    Abbott continued to report increasing prices for 5% Dextrose 500 ml after 1995. By reporting increasingly inflated DPs, Abbott caused the Red Book AWP for 5% Dextrose in Water, 500 ml, NDC # 00074-7922-03 to increase in 1996 to $9.71, in 1997 to $10.20, in 1998 to $10.71, in 1999 to $11.25 and in 2000 to $11.80. Medicaid and Medicare used these reported prices to set their reimbursement levels. At the same time, Abbott regularly sold the product to its Customers for $1.50 or less per bag of the water-based solution.

99.    Abbott's reporting of increasingly false and fraudulent prices for its 5% Dextrose 500ml reflects the manner in which Abbott implemented its scheme for all of the LVPs during the relevant time period. Abbott engaged in identical conduct with respect to the "prices" and marketing of the other LVP products and package sizes identified by NDC and HCPCS code in ¶¶ 31, 35 of this Complaint.

100.    Abbott used the false and fraudulent prices Abbott reported to the Price Publications for these water solutions to manipulate reimbursement; the reported prices did not reflect the actual prices Abbott was charging to its Customers.

101.    Due to Abbott's conduct, Abbott's Customers submitted inflated claims to Medicare and Medicaid and received millions of dollars in inflated reimbursement for these water and water-based solutions. Abbott profited off the scheme by increasing its sales volume and profits. Medicare and Medicaid have paid Abbott's Customers in excess of $100 million for

CIVIL ACTION NO: 95-1354-CIV-GOLD

Abbott's LVPs when the typical acquisition costs for those Customers were a fraction of that amount.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

102.     Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

103.     Abbott knowingly caused to be presented false or fraudulent claims for payment or approval to the United States for the Drugs for reimbursement that were substantially higher than providers' actual acquisition costs for the Drugs and based on reported prices that were fraudulently and artificially manipulated by Abbott. Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

104.     By virtue of the false or fraudulent claims that Abbott caused to be made, the United States has suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

CIVIL ACTION NO: 95-1354-CIV-GOLD

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False
Records or Statements to Cause Claims to be Paid)
(31 U.S.C. § 3729(a)(2))

105.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

106.    Abbott knowingly made, used, or caused to be made or used, false records or

statements – *i.e.*, the false certifications and representations made or caused to be made by

defendants to state Medicaid programs when seeking to ensure that the Medicaid programs

would reimburse for the Drugs, and the false representations to the Publishers upon which

Medicare and Medicaid relied – to cause false or fraudulent claims paid or approved by the

United States.

107.    By virtue of the false records or false statements made by Abbott, the United

States suffered damages and therefore is entitled to treble damages under the False Claims Act,

to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each

violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for

each violation occurring on or after September 29, 1999.

## THIRD CAUSE OF ACTION

(Unjust Enrichment)

108.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

109.    This is a claim for the recovery of monies by which Abbott has been unjustly

enriched, including profits earned by Abbott because of illegal inducements Abbott arranged to

be paid to its Customers.

27

CIVIL ACTION NO: 95-1354-CIV-GOLD

110.    By obtaining monies as a result of its violations of federal and state law, Abbott was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

111.    By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Abbott on sales to Customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

112.    Plaintiff repeats and realleges ¶¶ 1 through 101 as if fully set forth herein.

113.    Abbott made material and false representations concerning the prices of the Drugs with knowledge of their falsity or reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon Abbott's misrepresentations by making payments on the false claims.

114.    Had the true facts of Abbott's false price reporting as set forth in this Complaint been known to the United States, the United States would not have paid for Abbott products.

115.    By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Abbott, jointly and severally, as follows:

28

CIVIL ACTION NO: 95-1354-CIV-GOLD

1.     On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Third Cause of Action, for the damages sustained and/or amounts by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.     On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

CIVIL ACTION NO: 95-1354-CIV-GOLD

DATED this _____ day of March. 2006.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
MARK A. LAVINE
ANA MARIA MARTINEZ
JEFFREY W. DICKSTEIN
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov

_____
MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

30

**Sealed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED IN CAMERA AND UNDER** |
| ex rel. | ) | **SEAL PURSUANT TO** |
| | ) | **31 U.S.C. § 3730** |
| VEN-A-CARE OF THE | ) | |
| FLORIDA KEYS, INC. | ) | 06 - 21303 - CV - ASG |
| a Florida Corporation, | ) | |
| by and through its principal | ) | |
| officers and directors, | ) | |
| ZACHARY T. BENTLEY and | ) | |
| T. MARK JONES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO SEVER AS TO DEFENDANT ABBOTT LABORATORIES, INC.**

As anticipated in prior filings, the United States is now prepared to notice its intervention

as to Abbott Laboratories, Inc. (Abbott) in *United States ex rel. Ven-A-Care v. Abbott, et al.*,

Civil Action No. 95-1354-CIV-GOLD. For the sake of administrative ease, the United States

respectfully requests that this Court enter an order severing all claims against Abbott in that

action.[1] The United States has conferred with the relator, Ven-A-Care of the Florida Keys, Inc.,

and the relator has no objection to this motion.

---

[1] This case was consolidated with *United States ex rel. Ven-A-Care v. Abbott, et al.*, Civil
Action No. 02-23609-CIV-GOLD by Order of this Court dated February 21, 2003. The United
States is not moving to sever the claims against Abbott from that case. The United States
continues to investigate that matter – which has an intervention deadline of April 28, 2006 – and
is not making a decision on whether to intervene or not in the claims against Abbott in that case
at this time.





CIVIL ACTION NO: 95-1354-CIV-GOLD

This *qui tam* action has been filed against several defendants, including Abbott. The United States is now prepared to intervene against Abbott and is contemporaneously with this motion filing the United States' Notice of Partial Intervention and Complaint against Abbott. The United States will only be intervening as to claims relating to 46 Abbott NDCs[2] and billings for certain Abbott products under Medicare Healthcare Common Procedural Coding System (HCPCS), specifically claims for Abbott products billed under 11 Medicare HCPCS codes. The Relator will be proceeding on the non-intervened Abbott NDCs and J-Codes identified or implicated in their Fourth Amended Complaint.

To facilitate the management of this matter subsequent to the intervention against Abbott, the Government seeks to sever the all claims against Abbott -- both the intervened and non-intervened claims – in *United States ex rel. Ven-A-Care v. Abbott, et al.,* Civil Action No. 95-1354-CIV-GOLD. By severing the portion of the case against Abbott, it will be substantially easier to avoid complications potentially resulting from a portion of the case – *i.e.,* those claims relating to other defendants – remaining sealed while the claims against Abbott are unsealed and litigated.

The United States' Complaint will identify the claims and HCPCS codes upon which it is intervening. The Relator will file, after severance, a redacted copy of the complaint that only references its claims against Abbott – including both intervened and non-intervened Abbott claims – so that the original allegations against Abbott will be part of the unsealed file.

---

[2] The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code (NDC).

2

CIVIL ACTION NO: 95-1354-CIV-GOLD

The proposed order accompanying the United States' Notice of Partial Intervention has

been prepared on the basis that the relief requested herein has been granted.  Thus, the proposed

order only references Abbott.  As a result, no special handling will be necessary to preserve the

seal as to the remaining defendants because no mention of that part of the case is necessary if the

Abbott portion is severed.

THEREFORE, the United States respectfully requests that its Motion to Sever as to

Defendant Abbott Laboratories, Inc. be granted, and that the Court enter the attached proposed

Order severing the proceedings against Abbott.

DATED this _____17ᵗʰ_____ day of March, 2006.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
MARK A. LAVINE
ANA MARIA MARTINEZ
ANN ST. PETER-GRIFFITH
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101
Fla. Bar No. 648876
Mark.Lavine@usdoj.gov

3

CIVIL ACTION NO: 95-1354-CIV-GOLD

MICHAEL F. HERTZ
JOYCE R. BRANDA
RENÉE BROOKER
JUSTIN R. DRAYCOTT
GEJAA T. GOBENA
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

N:\mlavine\venacare\ABBOTT\Motion to Sever (2).3.17.06.wpd

4

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing was mailed this ___17th___ day of March, 2006 to:

> James J. Breen
> Alison Simon
> The Breen Law Firm, P.A.
> P.O. Box 297470
> Pembroke Pines, FL 33029-7470

ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD    O6-CV- 21303-A-S9

UNITED STATES OF AMERICA
ex rel.

VEN-A-CARE OF THE
FLORIDA KEYS, INC.
a Florida Corporation,
by and through its principal
officers and directors,
ZACHARY T. BENTLEY and
T. MARK JONES,
                Plaintiff,

vs.

ABBOTT LABORATORIES, INC. and
HOSPIRA, INC.,

             Defendants.
_____/

> FILED by _____ D.C.
>
> **MAY 1 6 2006**
>
> CLARENCE MADDOX
> CLERK U.S. DIST. CT.
> S.D. OF FLA. MIAMI

**ORDER ON UNITED STATES' MOTION TO SEVER AS TO DEFENDANT ABBOTT
LABORATORIES, INC.**

    **THIS CAUSE** having come before the Court upon United States' Motion to Sever as to

Defendant Abbott Laboratories, Inc., and the Court having reviewed and considered the Motion, and

having been otherwise advised in the premises and good cause having been shown, it is hereby,

    ORDERED AND ADJUDGED that:

    1.    All proceedings against Abbott Laboratories, Inc. and Hospira, Inc. in Case 95-1354-

CIV-GOLD are hereby severed and shall be managed as a separate case. The Clerk of Court is

directed to assign a new case number for the management of the severed portion of the case. All

pleadings related to the case against Abbott Laboratories, Inc. and Hospira, Inc. filed after the date

of this order shall bear the new case number assigned by the Clerk of Court.

RECD
MAY 1 8 2006
CLARENCE MADDOX
CLERK U.S. DIST. CT
S.D. OF FLA. MIAMI



CIVIL ACTION NO: 95-1354-CIV-GOLD

2.    For the convenience of the Court, the parties and the Clerk's Office, the parties and

Clerk's office are directed as follows:

a)    All pleadings, motions and other filings filed in the severed action under the new

case number will not be under seal, except as may be provided by subsequent orders;

b)    The Relator's counsel shall file under the new case number redacted copies of each

complaint filed in Case No. 95-1354-Civ-Gold.  The redacted copies of the prior

complaints shall disclose only that information pertinent to the newly severed action

against Abbott.   Upon the filing of an appearance in this matter by Abbott

Laboratories, Inc. and Hospira, Inc., the Relator shall serve Abbott Laboratories, Inc.

and Hospira, Inc. with the redacted copies of the complaints, with Relator's Motion

For Leave to Amend Complaint by Adopting United States' Complaint to Intervene,

and with this Court's Order granting that motion.

c)    The Clerk shall file under the new case number a copy of the each of the following:

1.    Government's Notice of Election to Intervene in Part and to Decline to
Intervene in Part;

2.    Order on United States' Notice of Election to Intervene in Part and to Decline
to Intervene in Part;

3.    Government's Complaint;

4.    United States' Motion to Sever as to Defendant Abbott Laboratories, Inc.

5.    Order on United States' Motion to Sever as to Defendant Abbott
Laboratories, Inc.

6.    Relator's Motion For Leave to Amend Complaint by Adopting United States'
Complaint to Intervene,

7.    Court's Order granting Relator's Motion For Leave to Amend Complaint by
Adopting United States' Complaint to Intervene.

CIVIL ACTION NO: 95-1354-CIV-GOLD

d)    The Clerk's Office shall also place a copy of this Order in the file for Case No. 95-

1354-Civ-Gold.

e)    All pleadings filed in Case No. 95-1354-Civ-Gold shall remain under seal, with the

exception of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this ⟋ day of ⟋⟋⟋,

2006.

ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:    Mark A. Lavine
       U.S. Attorney's Office
       99 N.E. 4th st.
       Miami, FL 33132
       Fax: (305) 536-4101

       James J. Breen
       Alison Simon
       The Breen Law Firm, P.A.
       P.O. Box 297470
       Pembroke Pines, FL 33029-7470
       Fax:(954) 874-1705

       Gejaa T. Gobena
       U.S. Department of Justice
       P.O. Box 261
       Ben Franklin Station
       Washington, DC  20044
       Fax: (202) 307-3852

C:\Documents and Settings\mlavine\Local Settings\Temporary Internet Files\OLK8B\sever order 5 10 06 wpd



# Department of Justice

**FOR IMMEDIATE RELEASE**
**THURSDAY, MAY 18, 2006**
**WWW.USDOJ.GOV**

CIV
**(202) 514-2007**
TDD (202) 514-1888

## United States Intervenes in Suit Against Abbott Laboratories Inc.

WASHINGTON, D.C. – The United States has intervened in a whistleblower suit filed against Abbott Laboratories Inc. (Abbott), alleging that the company violated the False Claims Act, the Department of Justice announced today. In its complaint, the government alleges that Abbott—a pharmaceutical manufacturer that sells brand and generic drugs that are reimbursed by the Medicare and Medicaid programs—engaged in a scheme to report fraudulent and inflated prices for several pharmaceutical products, knowing that federal healthcare programs established reimbursement rates based on those reported prices.

The government's complaint alleges that from at least on or before January 1, 1991 Abbott's Hospital Products Division (HPD) reported prices that were more than 10 times (1000 percent) the actual sales prices on many of the drugs it manufactures. The United States alleges that federal healthcare programs, both Medicare and Medicaid, have reimbursed Abbott's customers in excess of $175 million for the drugs which are the subject of the complaint.

The difference between the inflated government reimbursement rates and the actual price paid by healthcare providers for a drug is referred to as the "spread." The larger the spread on a drug, the larger the profit or return on investment for the provider. The United States alleges that Abbott used artificially inflated spreads to market, promote, and sell the drugs to existing and potential customers. Because reimbursement from federal programs was based on the fraudulent inflated prices, the United States contends that Abbott caused false and fraudulent claims to be submitted to federal healthcare programs.

"This complaint marks another step in the government's investigation and prosecution of pharmaceutical manufacturers who submit fraudulent drug pricing information that costs the federal healthcare programs and taxpayers millions of dollars," said Assistant Attorney General Peter D. Keisler, of the Justice Department's Civil Division.

"The filing of this lawsuit reflects the government's dedication to pursuing large-scale pharmaceutical pricing fraud cases that squander scarce resources needed to provide for the health care needs of the poor, the elderly and the disabled," said R. Alexander Acosta, U.S. Attorney for the Southern District of Florida.

The investigation began after the filing of a civil False Claims Act suit by a local home-infusion company, Ven-A-Care of the Florida Keys Inc., and its principals. The civil False Claims Act allows for private persons to file whistleblower suits to provide the government information about wrongdoing. Under the statute, if it is established that a person has submitted or caused others to submit false or fraudulent claims to the United States, the government can recover treble damages and $5,500 to $11,000 for each false or fraudulent claim filed. If the government is successful in resolving or litigating its claims, the whistleblower who initiated the action can receive a share of between 15 percent to 25 percent of the amount recovered.

The law suit, called a qui tam action, was filed in the U.S. District Court for the Southern District of

EXHIBIT C

Florida and was assigned to U.S. District Court Judge Alan Gold. This investigation was conducted by the U.S. Department of Justice, the U.S. Attorney's Office for the Southern District of Florida, and the Office of Inspector General of the Department of Health and Human Services.

### ###

06-309



Joseph W. Letzer
Direct Dial: (205) 458-5212
Direct Fax: (205) 244-5671
Email: jletzer@burr.com

# BURR & FORMAN LLP

· ATTORNEYS AND COUNSELORS ·

420 North Twentieth Street, Suite 3100
Birmingham, Alabama 35203-5206

(205) 251-3000

October 12, 2006

**VIA HAND DELIVERY**

Honorable Charles Price
Presiding Judge
Circuit Court of Montgomery County
Courthouse
251 South Lawrence Street
Montgomery, AL 36102

**Re:    *State of Alabama v. Abbott Laboratories, Inc., et al.***
       **Case No. CV-05-219**

Dear Judge Price:

This firm represents defendant Dey, LP ("Dey") in this action. Enclosed with this letter is a courtesy copy of the notice of removal that Dey filed in this action yesterday. Contemporaneously, Dey also filed notices of removal in similar pharmaceutical pricing cases pending in Florida, Illinois, Kentucky, Mississippi, Nevada, Ohio, Pennsylvania, South Carolina, and Wisconsin and in the New York counties of Erie, Oswego and Schenectady. In addition, Dey moved to supplement the notices of removal previously filed in pricing actions brought by the States of Arizona and Hawaii to incorporate the removal grounds set forth in the enclosed removal notice.

The timing of the instant removal was prompted by Dey's receipt, on September 11, 2006, of a complaint in a federal *qui tam* action which alleges that the United States has claims against Dey under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), in connection with Dey's alleged reporting of published AWP and WAC prices. The claims asserted in the federal *qui tam* action are intertwined with the claims asserted by the State of Alabama here.

One of the FCA provisions under which the United States is suing, 31 U.S.C. § 3732(b), provides that the federal district courts shall have jurisdiction over "any action" brought under the laws of a state for the recovery of funds paid by the state where the state law action "arises from the same transaction or occurrence as an action brought under section 3730" of the FCA. Since, the transactions at issue in this action against Dey and the federal *qui tam* action are the same, section 3732(b) supplies the federal courts with jurisdiction over this matter and rendered this action removable.

Birmingham     •     Montgomery     •     Atlanta     •     Jackson     •     Laurel

1508901

EXHIBIT D

BURR & FORMAN LLP

Honorable Charles Price
October 12, 2006
Page 2

Dey and the other defendants in this matter appreciate the care and thoughtful attention the Court has brought to this case.

Very truly yours,

Joseph W. Letzer

JWL/cfe
Enclosure

cc:    Special Master Simeon F. Penton, Esq. (w/enc.)
       Special Master Jimmy Pool, Esq. (w/enc.)
       Counsel for Plaintiff (via U.S. Mail)
       Counsel for Defendants (via e-mail)

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

STATE OF ALABAMA

           Plaintiff,

v.

ABBOTT LABORATORIES, INC., *et al.*,

           Defendants.

Case No. _____

[Case No. CV-05-219 in the Circuit
Court of Montgomery County,
Alabama]

DEFENDANT PAR PHARMACEUTICAL INC.'S NOTICE OF
CONSENT TO REMOVAL

       Defendant Par Pharmaceutical Inc. hereby serves notice that it consents to the

removal of this action to the United States District Court for the Middle District of Alabama.

Dated:   October 10, 2006

Of counsel:

Richard M. Cooper (*pro hac vice*)
Paul K. Dueffert (*pro hac vice*)
Thomas J. Roberts (*pro hac vice*)
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029

Respectfully submitted,

George W. Walker, III (WAL097)
COPELAND, FRANCO, SCREWS & GILL, P.A.
P. O. Box 347
Montgomery, Alabama 36101-0347
Telephone: (334) 834-1180
Facsimile: (334) 834-3172

Attorneys for Defendant
Par Pharmaceutical, Inc.

EXHIBIT E